# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BARBARA PIPER, as Executrix of the Estate of Michael Piper, Deceased, on behalf of herself and all others similarly situated,** | |
| *Plaintiff,* | |
| **v.** | |
| **BAYER CROPSCIENCE LP, BAYER CROPSCIENCE INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK, INC., SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,** | Case No. 3:21-CV-00021-NJR |
| *Defendants.* | |
| **JOHN C. SWANSON, individually and on behalf of all others similarly situated,** | |
| *Plaintiff,* | |
| **v.** | |
| **BAYER CROPSCIENCE LP, BAYER CROPSCIENCE INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK, INC., GROWMARK FS, LLC, SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,** | Case No. 3:21-CV-00046-NJR |
| *Defendants.* | |

**CHARLES LEX,**

     *Plaintiff,*

**v.**

**BAYER CROPSCIENCE LP, BAYER CROPSCIENCE INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK, INC., SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,**

     *Defendants.*

Case No. 3:21-CV-00122-NJR

---

**JONES PLANTING CO. III, on behalf of itself and all others similarly situated,**

     *Plaintiff,*

**v.**

**BAYER CROPSCIENCE LP, BAYER CROPSCIENCE INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK, INC., SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,**

     *Defendants.*

Case No. 3:21-CV-00173-NJR

**JASON J. CANJAR D/B/A YEDINAK REGISTERED HOLSTEINS, on behalf of himself and all others similarly situated,**

   *Plaintiff,*

**v.**

**BAYER CROPSCIENCE LP, BAYER CROPSCIENCE INC., CORTEVA INC., CARGILL INCORPORATED, BASF CORPORATION, SYNGENTA CORPORATION, WINFIELD SOLUTIONS, LLC, UNIVAR SOLUTIONS, INC., FEDERATED CO-OPERATIVES LTD., CHS INC., NUTRIEN AG SOLUTIONS INC., GROWMARK, INC., SIMPLOT AB RETAIL SUB, INC., AND TENKOZ INC.,**

   *Defendants.*

Case No. 3:21-CV-00181-NJR

### DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CLASS ACTION CONSOLIDATED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................4

I.  The Parties .......................................................................................................................4

II.  The Alleged "Crop Inputs" Market..................................................................................5

III.  The Emergence of "Electronic Platforms" ......................................................................6

IV.  The Alleged Joint Boycott ...............................................................................................8

V.  Defendant-Specific Allegations .....................................................................................10

    A.  Manufacturer Defendants....................................................................................10

    B.  Wholesaler Defendants .......................................................................................11

    C.  Retailer Defendants.............................................................................................12

LEGAL STANDARD ..............................................................................................................13

ARGUMENT ...........................................................................................................................14

I.  PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE CONSPIRACY TO BOYCOTT
    ELECTRONIC PLATFORMS .......................................................................................14

    A.  Plaintiffs Rely on Impermissible Group Pleading, Without Pleading the
        Requisite Specifics as to Each Defendant's Participation in the Alleged
        Conspiracy ...........................................................................................................16

    B.  Plaintiffs Fail to Plead a Plausible Conspiracy Through Either Direct or
        Circumstantial Evidence .....................................................................................17

        1.  Plaintiffs Allege No Direct Evidence of a Conspiracy .............................17

        2.  Plaintiffs Allege Only Parallel Conduct that Is Equally Consistent
            with Independent Responses to FBN's Entering the Market....................17

        3.  Plaintiffs Fail to Allege Plus Factors Suggestive of a Conspiracy ...........20

            i.  Defendants' Reactions to Electronic Platforms Was
                Predictable and Not Contrary to Their Alleged Self-Interest .......21

            ii.  Defendants' Alleged Opportunities to Conspire Are Nothing
                More than Routine Trade Association Involvement.....................26

            iii.  Market Concentration Is Not a Plus Factor Because Plaintiffs
                Have Not Adequately Pled That Any Market Is Concentrated......28

            iv.  Government Investigations Against a Subset of Defendants
                Does Not Render the Allegations Any More Plausible ................30

|  |  | v. | Prior Antitrust Violations Are Not Indicative of a Conspiracy ...................................................................34 |
| | | 4. | The Timing of the Alleged Conspiracy Makes it Implausible.................35 |
| II. | | | PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AN INJURY THAT GIVES THEM STANDING TO PURSUE THEIR ANTITRUST CLAIMS .................36 |
| III. | | | PLAINTIFFS' SHERMAN ACT CLAIM IS UNTIMELY ............................38 |
| | A. | | Plaintiffs' Claim Should Be Dismissed to the Extent It Is Based on Conduct That Occurred Before the Four-Year Statute of Limitations .................38 |
| | B. | | Plaintiffs Do Not Plead Fraudulent Concealment....................................39 |
| | | 1. | Plaintiffs Do Not Plead Separate Acts of Concealment............................40 |
| | | 2. | Plaintiffs Do Not Plead Reasonable Diligence .........................................42 |
| IV. | | | ALL OF PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED................43 |
| | A. | | All of Plaintiffs' State-Law Claims Fail for the Same Reasons That Their Federal Claim Fails ...........................................................................43 |
| | B. | | Plaintiffs Do Not Have Article III Standing ............................................45 |
| | | 1. | Plaintiffs Lack Article III Standing Because They Fail to Allege Cognizable Injuries ..............................................................................45 |
| | | 2. | Plaintiffs Lack Article III Standing to Sue under the Laws of 23 States Where They Do Not Reside or Did Not Suffer Injury ..................45 |
| | C. | | Plaintiffs' Claims Fail in Certain States for Reasons Specific to Those States' Laws ..........................................................................................47 |
| | | 1. | Three of Plaintiffs' State Antitrust Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements....................................47 |
| | | 2. | Four of Plaintiffs' State-Law Claims Should Be Dismissed for Lack of Any Alleged Intrastate Misconduct or Substantial Intrastate Effects ...................................................................................................48 |
| | D. | | Plaintiffs' Antitrust Claims Are Untimely in All 27 States ...............................48 |
| CONCLUSION................................................................................................................49 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackerman v. Nw. Mut. Life Ins. Co.*,
    172 F.3d 467 (7th Cir. 1999) ..........................................................................40, 41

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
    683 F.3d 328 (7th Cir. 2012) ..........................................................................15, 29

*Alexander v. Phx. Bond & Indem. Co.*,
    149 F. Supp. 2d 989 (N.D. Ill. 2001) ......................................................................16

*Allen v. Wright*,
    468 U.S. 737 (1984)..................................................................................................46

*Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO*,
    640 F.2d 1368 (1st Cir. 1981) ..................................................................................14

*Angiulo v. United States*,
    867 F. Supp. 2d 990 (N.D. Ill. 2012) ......................................................................41

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................13

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ........................................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................... *passim*

*Ben Sheftall Distrib. Co. v. Mirta de Perales, Inc.*,
    791 F. Supp. 1575 (S.D. Ga. 1992)..........................................................................24

*Berkson v. Del Monte Corp.*,
    743 F.2d 53 (1st Cir. 1984) ......................................................................................42

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ....................................................................................39

*Bryant v. Compass Grp. USA, Inc.*,
    958 F.3d 617 (7th Cir. 2020) ....................................................................................36

*Cada v. Baxter Healthcare Corp.*,
    920 F.2d 446 (7th Cir. 1990) ....................................................................................40

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
  No. 18 Civ. 11932, 2019 WL 1949801 (S.D.N.Y. Apr. 17, 2019)....................................23, 24

*In re Chocolate Confectionary Antitrust Litig.*,
  801 F.3d 383 (3d Cir. 2015)...................................................................................19, 31

*Color Switch, LLC v. Fortafy Games DMCC*,
  377 F. Supp. 3d 1075(E.D. Cal. 2019), *aff'd*, 818 F. App'x 694 (9th Cir. 2020)...................32

*Comm'r of Competition v. Winfield United Can. ULC*,
  T-156-20 (Ottawa, Ontario, Feb. 11, 2020)...........................................................................32

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
  433 U.S. 36 (1977)..................................................................................................................25

*In re Copper Antitrust Litig.*,
  436 F.3d 782 (7th Cir. 2006) ............................................................................................39, 40

*Costco Wholesale Corp. v. Maleng*,
  522 F.3d 874 (9th Cir. 2008) .................................................................................................37

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)................................................................................................................46

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
  MDL No. 2031, 2013 WL 4506000 (N.D. Ill. Aug. 23, 2013).............................................46

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 510 (N.D. Ill. 2019) ....................................................................................48

*Diedrich v. Ocwen Loan Servicing, LLC*,
  839 F.3d 583 (7th Cir. 2016) .................................................................................................36

*Dunnivant v. Bi-State Auto Parts*,
  851 F.2d 1575 (11th Cir. 1988) .............................................................................................26

*In re Dynamic Random Access Memory Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................................................................................48

*In re Dynamic Random Access Memory Indirect Purchaser Litig.*,
  No. 4:18-CV-2518, 2020 WL 8459279 (N.D. Cal. Nov. 24, 2020) .......................................28

*F.T.C. v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986)................................................................................................................44

*State ex rel. Fitch v. Yazaki N. Am., Inc.*,
  294 So. 3d 1178 (Miss. 2020).................................................................................................48

iv

*Four B Corp. v. Dicel Chem. Indus. Ltd.*,
  253 F. Supp. 2d 1147 (D. Kan. 2003) ...................................................................49

*Freeman Indus., LLC v. Eastman Chem. Co.*,
  172 S.W.3d 512 (Tenn. 2005)..............................................................................48

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................................33

*Gunawardana v. Am. Veterinary Med. Ass'n*,
  No. 19-CV-96, 2021 WL 289652 (S.D. Ill. Jan. 28, 2021)......................................36

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..............................................................................17

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
  231 F. Supp. 2d 1253 (N.D. Ga. 2002) ...............................................................34

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
  No. 11 C 07834, 2014 WL 6845862 (N.D. Ill. Dec. 4, 2014) ..................................24

*In re Humira (Adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020) ..................................................................45

*In re ICE LIBOR Antitrust Litig.*,
  No. 19 CIV. 439, 2020 WL 1467354 (S.D.N.Y. Mar. 26, 2020) ..............................34

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)...........................................................................................37

*In re Interest Rates Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)............................................................3, 7, 22

*In re Interior Molded Doors Antitrust Litig.*,
  No. 3:18-cv-718, 2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ..............................46

*Jones v. Micron Tech. Inc.*,
  400 F. Supp. 3d 897 (N.D. Cal. 2019) ............................................................32, 46

*Kawczynski v. Am. Coll. of Cardiology*,
  670 F. App'x 398 (7th Cir. 2016) ........................................................................37

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)......................................................................................39, 42

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) ........................28

*State ex rel. Leech v. Levi Strauss & Co.*,
    1980 WL 4696 (Tenn. Ch. Sept. 25, 1980),...............................................................49

*Lewis v. Casey*,
    518 U.S. 343 (1996)........................................................................................................45

*In re Lipitor Antitrust Litig.*,
    336 F. Supp. 3d 395 (D.N.J. 2018) ...............................................................................47

*In re Local TV Advert. Antitrust Litig.*,
    No. 18 C 6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020)...................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)................................................................................................36, 37

*Mack v. Bristol-Myers Squibb Co.*,
    673 So.2d 100 (Fla. Dist. Ct. App. 1996) ...................................................................44

*Marion Diagnostic Ctr. LLC v. Becton, Dickinson & Co.*,
    No. 3:18-CV-1059, 2021 WL 961728 (S.D. Ill. Mar. 12, 2021) .............................15

*Marion Healthcare, LLC v. Becton Dickinson & Co.*,
    952 F.3d 832 (7th Cir. 2020) ................................................................................14, 15

*Marion HealthCare LLC v. S. Ill. Healthcare*,
    No. 12-CV-00871, 2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ...........................45

*Menominee Indian Tribe of Wisc. v. Thompson*,
    161 F.3d 449 (7th Cir. 1998) .........................................................................................33

*In re Mex. Gov't Bonds Antitrust Litig.*,
    412 F. Supp. 3d 380 (S.D.N.Y. 2019)...................................................19, 20, 31

*Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*,
    476 F.3d 442 (7th Cir. 2007) .........................................................................................24

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)................................................................................................24, 28

*Moore v. Boating Indus. Ass'ns*,
    819 F.2d 693 (7th Cir. 1987) .........................................................................................26

*MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*,
    No. 18 C 00379, 2019 WL 11658793 (N.D. Ill. Jan. 25, 2019) ...............................1

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ..............................................................................14, 27

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009)...........................................................................22

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ........................................................20, 35

*Pastorelli Food Prods., Inc. v. Pillsbury Co.*,
    No. 87 C 20233, 1989 WL 58366 (N.D. Ill. Apr. 11, 1989)...................40

*Payton v. Cnty. of Kane*,
    308 F.3d 673 (7th Cir. 2002) ...........................................................46

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
    828 F.2d 211 (4th Cir. 1987) ...........................................................40

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
    988 F. Supp. 2d 696 (E.D. La. 2013) .................................................23

*In re Pork Antitrust Litig.*,
    No. 18-1776, 2019 WL 3752497 (D. Minn. Aug. 18, 2019).............20, 21

*Protect Our Parks, Inc. v. Chicago Park Dist.*,
    971 F.3d 722 (7th Cir. 2020) ...........................................................36

*Rick-Mik Enters. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ...........................................................45

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ...........................................................29

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ...........................................................36

*Simms v. Acevedo*,
    595 F.3d 774 (7th Cir. 2010) ...........................................................43

*Tera Grp. Inc. v. Citigroup, Inc.*,
    No. 17 CIV. 4302, 2019 WL 3457242 (S.D.N.Y. July 30, 2019) ...........16

*In re Terazosin Hydrochloride Antitrust Litig.*,
    160 F. Supp. 2d 1365 (S.D. Fla. 2001) ..............................................46

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ................................................17, 18, 27

*Thelen v. Marc's Big Boy Corp.*,
    64 F.3d 264 (7th Cir. 1995) .............................................................39

*Tichy v. Hyatt Hotels Corp*,
    376 F. Supp. 3d 821 (N.D. Ill. 2019) ..............................................................................26, 27

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) .................................................................................................16

*Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*,
    502 F.3d 47 (2d Cir. 2007)......................................................................................................31

*In re Tyson Foods, Inc. Sec. Litig.*,
    275 F. Supp. 3d 970 (W.D. Ark. 2017)....................................................................................27

*United States v. Airline Tariff Publ'g Co.*
    836 F. Supp. 9 (D.D.C. 1993) .................................................................................................37

*United States v. Colgate & Co.*,
    250 U.S. 300 (1919)............................................................................................................22, 26

*United States v. Kmart Corp.*,
    No. 12-CV-881, 2014 WL 11696711 (S.D. Ill. Sept. 26, 2014)..............................................28

*United States v. New-Form Mfg. Co.*,
    27 C.I.T. 905 (2003) ................................................................................................................32

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)................................................................................................................22

*Warth v. Seldin*,
    422 U.S. 490 (1975)................................................................................................................45

*Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ................................................................................28, 33

*Wash. Cnty. Health Care Auth., Inc. v. v. Baxter Int'l Inc.*,
    No. 16-CV-10324, 2020 WL 1666454 (N.D. Ill. Apr. 3, 2020) ..............................................20

*Zirvi v. Flatley*,
    433 F. Supp. 3d 448 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020)..............................41

*Zirvi v. Flatley*,
    838 F. App'x 582 (2d Cir. 2020) ............................................................................................40

**Statutes**

9 Vt. Stat. § 2451a(h)..............................................................................................................45

9 Vt. Stat. § 2453a...................................................................................................................45

12 Vt. Stat. § 511 ....................................................................................................................49

15 U.S.C. § 1 ............................................................................................ *passim*

15 U.S.C. § 15b .................................................................................................. 38

15 U.S.C. § 45(a)(1) ........................................................................................... 44

415 Ill. Comp. Stat. 60/4 .................................................................................. 26

505 Ill. Comp. Stat. 110 .................................................................................... 26

740 Ill. Comp. Stat. 10/3(2) .............................................................................. 44

740 Ill. Comp. Stat. 10/7(2) .............................................................................. 49

Ariz. Rev. Stat. § 44-1402 ................................................................................. 44

Ariz. Rev. Stat. § 44-1410 ................................................................................. 49

Ariz. Rev. Stat. § 44-1415(A) ............................................................................ 47

Cal. Bus. & Prof. Code § 16720 ........................................................................ 44

Cal. Bus. & Prof. Code § 16726 ........................................................................ 44

Cal. Bus. & Prof. Code § 16750.1 ..................................................................... 49

Cal. Bus. & Prof. Code § 17208 ........................................................................ 49

Conn. Gen. Stat. § 35-26 ................................................................................... 44

Conn. Gen. Stat. § 35-40 ................................................................................... 49

Fla. Stat. § 95.11(3)(f) ....................................................................................... 49

Fla. Stat. § 501.204 ........................................................................................... 44

Haw. Rev. Stat. § 480-4 ..................................................................................... 44

Haw. Rev. Stat. § 480-13.3(1) ........................................................................... 47

Haw. Rev. Stat. § 480-24 ................................................................................... 49

Iowa Code 553.4 ................................................................................................ 44

Iowa Code 553.16(2) ......................................................................................... 49

Kan. Stat. § 50-101 ............................................................................................ 44

Md. Code Com. Law § 11-204(a)(1) .................................................................. 44

Md. Code Com. Law § 11-209(d)(1) ...........................................................................49

Me. Rev. Stat. Title 10, § 1101 .................................................................................44

Me. Rev. Stat. Title 14, § 752 ..................................................................................49

Mich. Comp. Laws § 445.772 ....................................................................................44

Mich. Comp. Laws § 445.781 ....................................................................................49

Minn. Stat. § 325D.51 ..............................................................................................44

Minn. Stat. § 325D.64 ..............................................................................................49

Miss. Code § 75-21-1(a) ...........................................................................................44

N.C. Gen. Stat. § 75-1 .............................................................................................44

N.C. Gen. Stat. § 75-16.2 .........................................................................................49

N.D. Cent. Code § 51-08.1-02 ..................................................................................44

N.D. Cent. Code § 51-08.1-10 ..................................................................................49

N.H. Rev. Stat. § 356:12.II .......................................................................................49

N.H. Rev. Stat. § 598A.060 ......................................................................................44

N.M. Stat. § 57-1-1 .................................................................................................44

N.M. Stat. § 57-1-12 ...............................................................................................49

N.Y. Gen. Bus. Law § 340(1) ...................................................................................44

N.Y. Gen. Bus. Law § 340(5) ...................................................................................49

Neb. Rev. Stat. § 25-212 ..........................................................................................49

Neb. Rev. Stat. § 59-801 ..........................................................................................44

Nev. Rev. Stat. § 598A.060(c) ..................................................................................44

Nev. Rev. Stat. § 598A.210(3) ..................................................................................47

Nev. Rev. Stat. § 598A.220(1) ..................................................................................49

Or. Rev. Stat. § 646.725 ...........................................................................................44

Or. Rev. Stat. § 648.800.2 ........................................................................................49

x

S.D. Codified Laws § 37-1-3.1 ...............................................................................................44

S.D. Codified Laws § 37-1-14.4 .............................................................................................49

Tenn. Code § 47-25-101 .........................................................................................................45

Utah Code Ann. § 76-10-3109(9) ...........................................................................................47

Utah Code § 76-10-3104 .........................................................................................................44

Utah Code § 76-10-3117 .........................................................................................................49

W. Va. Code 47-18-4 ..............................................................................................................44

W. Va. Code 47-18-11 ............................................................................................................49

Wis. Stat. § 133.03 ..................................................................................................................44

Wis. Stat. § 133.18(2) .............................................................................................................49

**Rules**

Fed. R. Civ. P. 9(b) ..............................................................................................................3, 40

Fed. R. Civ. P. 9(f) .............................................................................................................40, 42

Fed. R. Civ. P. 12(b) ............................................................................................................1, 39

**Other Authorities**

ABA Model Jury Instrs. in Civil Antitrust Cases § 7.A.2 n.4 (2016 ed.) .....................................40

Phillip E. Areeda, Antitrust Law, ¶ 1421a .................................................................................34

Pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6), Defendants jointly move to dismiss the Class Action Consolidated Complaint ("Complaint") [ECF No. 58].[1]

## PRELIMINARY STATEMENT

Plaintiffs, individual purchasers of Crop Inputs (*i.e.*, "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides," Compl. ¶ 1), allege that the 16 Defendants—each described as a manufacturer, wholesaler, or retailer—conspired across three distribution levels to restrain trade in a purported market for Crop Inputs. Specifically, Plaintiffs allege that Defendants boycotted the entry of so-called "electronic platforms" into the marketplace by refusing to supply at least one of them with Crop Inputs. The Complaint fails for several fundamental reasons.

*First*, Plaintiffs' conspiracy claim must be dismissed because it is based on conclusory allegations of collective conduct without any differentiation among Defendants. "[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Rather, "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of *collective* responsibility *must be dismissed*." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (emphasis added); *see also MSP Recovery Claims, Series LLC v. Mallinckrodt ARD Inc.*, No. 18 C 00379, 2019 WL 11658793, at *1 n.4 (N.D. Ill. Jan. 25, 2019) ("'group pleading'—where a plaintiff's allegations simply lump defendants together without describing which defendant is responsible for what conduct or when each defendant participated in that unspecified conduct—is insufficient at the motion-to-dismiss stage"). Plaintiffs' Complaint rests

---

[1] Motions to dismiss are being filed contemporaneously by the following Defendants based on separate individualized issues: (1) Cargill Inc.; (2) Federated Co-operatives Ltd.; (3) Syngenta Corp.; and (4) Univar Solutions, Inc. Each of those Defendants also join fully in this Motion.

on conclusory allegations that "Defendants conspired" and on undifferentiated references to "Manufacturer, Wholesaler, and Retailer Defendants." *See, e.g.*, *id.* ¶¶ 6, 63, 64. No amount of creative labeling can overcome the absence of facts evidencing a horizontal agreement among Defendants at any level of distribution, much less up and down three levels of the supply chain. Nor does the Complaint offer the requisite detail as to when or where such a conspiracy was formed, or who entered into it.

*Second*, the limited specific conduct alleged is consistent with independent, rational, and non-conspiratorial behavior, and does not support an inference that any conspiracy exists. The "crucial question" in determining whether a complaint adequately alleges an antitrust conspiracy is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Twombly*, 550 U.S. at 553 (quoting *Theater Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). Where, as here, the existence of an unlawful agreement rests on allegations that Defendants engaged in parallel behavior, those allegations "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That is because, without more, "parallel conduct does not suggest conspiracy," *id.* at 556–57; it is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. In this case, Plaintiffs fail to allege parallel conduct or any conduct that suggests a conspiracy.

Defendants' alleged resistance to electronic platforms was entirely consistent with each Defendant's independent commercial interests. Indeed, the Complaint alleges that electronic platforms were going to "disrupt" the industry (*id.* ¶ 55) and cut into already "slim margins" (*id.* ¶ 61). It would not be surprising if each Defendant, independently perceiving the threat posed by

the platforms, "liked the world the way it was." *Twombly*, 550 U.S. at 568. This provides good reason for each "to maintain the status quo and to discourage, not facilitate . . . [these] platforms from taking root." *In re Interest Rates Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 464 (S.D.N.Y. 2017) ("*In re IRS*") (dismissing group boycott claims as implausible because the complaint itself explained why it was in each defendant's interest to oppose new electronic trading platforms). "[R]esisting competition is routine market conduct," and "if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a [Sherman Act] § 1 violation against almost any group of competing businesses would be a sure thing." *Twombly*, 550 U.S. at 566.

*Third*, the antitrust claims should be dismissed because Plaintiffs do not allege the basic element for Article III standing—that they suffered an antitrust injury plausibly caused by Defendants' alleged conspiracy. Plaintiffs merely hypothesize that absent the alleged conspiracy there would have been more transparency in the market regarding pricing. But the Complaint is entirely devoid of facts showing how Plaintiffs were injured by this alleged lack of transparency or how electronic platforms would have impacted competition.

*Fourth*, the Sherman Act § 1 claim should be dismissed as to conduct preceding the four-year statute of limitations. Although Plaintiffs attempt to avert this outcome by invoking the doctrine of "fraudulent concealment," they do not come close to pleading facts supporting the requisite elements of fraudulent concealment—separate acts of concealment by Defendants, and reasonable diligence on the part of Plaintiffs. Nor do they plead fraudulent concealment with the particularity required by Federal Rule of Civil Procedure 9(b).

*Finally*, all of Plaintiffs' state-law claims fail for the same reasons that their Sherman Act § 1 claim fails—there is no adequately-pled conspiracy. In addition, Plaintiffs lack Article III

standing because they fail to allege actual injury and because they were not injured in 23 of the 27 states whose laws they invoke because no named Plaintiff resides or bought Crop Inputs in those states. Certain state-law claims fail for independent state-specific reasons, as follows: (i) three fail to satisfy filing-notice requirements; and (ii) four do not allege that any of Defendants' misconduct occurred within those states or that Defendants' misconduct had a substantial effect (beyond merely raising prices) on those states' commerce. Finally, all of Plaintiffs' state claims are untimely.

In sum, the Complaint does not contain what it must to survive a motion to dismiss—factual matter backing up their conspiracy claims. Neither the facts nor the legal theory can support viable antitrust claims and, as a result, the Complaint should be dismissed.

## FACTUAL BACKGROUND

### I.    THE PARTIES

Plaintiffs[2] are direct and indirect purchasers of Crop Inputs, which Plaintiffs allege encompass a wide range of products used by growers: "seeds and chemicals such as fertilizer, insecticide, and herbicide." Compl. ¶ 46. Plaintiffs allege that 16 differently situated Defendants conspired to boycott so-called "electronic platforms," resulting in an "opaque" market that caused higher Crop Input prices. Plaintiffs sued companies that manufacture Crop Inputs ("Manufacturer Defendants"),[3] wholesalers that distribute Crop Inputs ("Wholesaler Defendants"),[4] and

---

[2] Named Plaintiffs are Barbara Piper; John C. Swanson; Charles Lex; Schofield Farms, LLC; Jones Planting Co. III; and Jason J. Canjar. Compl. ¶¶ 16–21.

[3] The "Manufacturer Defendants" are alleged to include: Bayer CropScience Inc.; Bayer CropScience LP; BASF Corporation; Corteva Inc.; Pioneer Hi-Bred International, Inc.; and Syngenta Corporation. *Id*. ¶¶ 2, 27.

[4] The "Wholesaler Defendants" are alleged to include: Cargill, Inc.; Univar Solutions, Inc.; and Winfield Solutions, LLC. *Id*. ¶ 2.

companies that allegedly sell Crop Inputs at retail ("Retailer Defendants").[5] Plaintiffs do not include all manufacturers, wholesalers and retailers of Crop Inputs, and do not explain why certain industry participants have been excluded.

Plaintiffs do not allege that they attempted to buy Crop Inputs through an electronic platform, that they were prevented from purchasing any Crop Input product, or that they were unable to obtain price information for any Crop Input product that they sought to purchase. Plaintiffs also do not allege that their purchases of Crop Inputs would have been impacted in any way by the entry of electronic platforms into the marketplace. Plaintiffs purport to represent two classes of persons or entities that purchased Crop Inputs manufactured by the Manufacturer Defendants in the United States from January 1, 2014, through the present, from (A) a Defendant, or (B) "a retailer other than a Retailer Defendant." *Id.* ¶ 98.

## II. THE ALLEGED "CROP INPUTS" MARKET

Plaintiffs allege in conclusory fashion that "[t]his action involves the markets for Crop Inputs, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs." *Id.* ¶ 42. Plaintiffs elsewhere refer to the "Crop Inputs Market" (singular), rather than separate retail, wholesale, and manufacturing "markets." Regardless, Plaintiffs do not explain why a wide variety of non-interchangeable products (in the thousands of varieties) falling under their own definition of "Crop Inputs" (*e.g.*, different seeds for various crops and different chemicals for various uses) (*id.* ¶¶ 44, 46, 81) are somehow part of the same market even though a seed obviously does not compete with a fungicide, which does not compete with

---

[5] The "Retailer Defendants" are alleged to include: CHS Inc.; Federated Co-operatives Ltd. (a Canadian company); GROWMARK, Inc.; Nutrien Ag Solutions, Inc.; Simplot AB Retail Sub, Inc.; and Tenkoz Inc. *Id.*

fertilizer. They allege without support and in a single sentence that "[t]he relevant geographic market is the United States." *Id.* ¶ 43. Plaintiffs further allege in barebones fashion that the "market for Crop Inputs is highly concentrated" (*id.* ¶ 81), but fail to make any specific allegations that plausibly allege market concentration at any level, and most importantly, offer *no* allegations about the *retail* marketplace in which the Plaintiffs purchased their Crop Inputs.

Plaintiffs allege that the Crop Inputs market is "structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about Crop Inputs purchases." *Id.* ¶ 47. The Complaint alleges that the wholesalers and retailers contract with Manufacturer Defendants "authorizing [them] to purchase and distribute Crop Inputs and entitling [them] to special rebates." *Id.* ¶¶ 30–32, 34–39. The Complaint further asserts that the Manufacturer Defendants permit only wholesalers and certain "authorized retailers" to sell their products (*id.* ¶ 49) and that those authorized retailers must sign confidentiality provisions prohibiting them from disclosing the Manufacturer Defendants' pricing information to third parties (*id.* ¶ 50). Plaintiffs further allege that wholesalers include confidentiality provisions in their contracts with retailers, which prohibit retailers from disclosing the price paid to the wholesaler or the price at which retailers sell the products to other farmers. *Id.* ¶ 52. Plaintiffs then leap to the conclusion that maintaining price confidentiality results in higher Crop Input prices (*id.* ¶ 47), without explaining how electronic platforms could or would increase price transparency or why transparency would reduce prices. Nowhere do Plaintiffs allege that they or other growers were unable to obtain retail quotes for Crop Inputs to make informed choices about their Crop Input purchases.

## III.    THE EMERGENCE OF "ELECTRONIC PLATFORMS"

Plaintiffs claim that "as early as January 1, 2014," Defendants entered into a conspiracy to boycott "entities that would have introduced price-reducing electronic purchasing of Crop Inputs."

*Id.* ¶¶ 118–19. Plaintiffs do not define what an "electronic platform" is, and the only two platforms mentioned in the Complaint (XSAg.com and FBN) appear to serve very different functions. XSAg.com is alleged to be "essentially operating as a trading platform." *Id*. ¶ 60. Trading platforms do not buy or sell products, and there is no explanation of how the boycott alleged here could impact a "trading platform."[6]

Almost all of the allegations in the Complaint are about a single platform, FBN. *Id.* ¶ 5. FBN is described in different parts of the Complaint as a "sales platform," a retailer, and a "service that provides objective performance data on Crop Inputs." *Id*. ¶¶ 5–6, 54. Plaintiffs allege that FBN entered the market as an electronic platform in 2016 (*id.* ¶ 57), at least *two years after* the supposed conspiracy is alleged to have formed. Plaintiffs assert that "[t]he success of electronic platforms drew negative attention from the Wholesaler and Retailer Defendants" (*id.* ¶ 55), but attribute most of this "negative attention" to two market observations made by *non-defendants*. First, Plaintiffs allege that CoBank, a financial institution, issued a report stating that "e-commerce companies pose a threat to brick-and-mortar ag retailers." *Id.* ¶ 56. Second, Plaintiffs allege that in February 2016, a trade association magazine published an article that was critical of electronic platforms. *Id.* ¶¶ 59–60. Plaintiffs further allege that the trade association's advisory council, composed of unidentified "'heads of major ag retailers, market suppliers, equipment makers, and other agricultural analysts,'" discussed "the threat posed by electronic platforms to retailers and wholesalers at its annual meeting." *Id.* ¶ 61. Plaintiffs do not allege that the trade association members said anything specific, took any specific action, or entered into any agreement.

---

[6] *See, e.g.*, *In re IRS*, 261 F. Supp. at 444 (describing "electronic trading platforms" as "akin to electronic 'order books,' which automatically match the best bids and offers," "facilitat[e] dealer-to-dealer trades," and charge "a commission, known as a 'brokerage fee,' on each trade.").

The only conduct in the United States that Plaintiffs attribute to specific Defendants is limited to FBN, is consistent with rational, independent conduct, and does not indicate the existence of any agreement to boycott. There are no specific allegations that any other electronic platform sells Crop Inputs at retail, or otherwise, or that any Defendant either sold or refused to sell to such platforms.

## IV.    THE ALLEGED JOINT BOYCOTT

Plaintiffs suggest that the Wholesaler and Retailer Defendants were motivated to thwart direct competition from electronic platforms by a desire "to retain their dominant market positions and supracompetitive profit margins" and that they "convince[d]" the Manufacturer Defendants not to supply to these potential customers "[b]ecause the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers." *Id.* ¶ 64. Plaintiffs allege that "starting in 2016," the Manufacturer Defendants complied with the "demands" of the Wholesaler and Retailer Defendants and "initiated a joint boycott of electronic platforms, including FBN." *Id.* ¶ 65. But Plaintiffs do not allege a single specific communication between any two Defendants about any topic at all, much less about any boycott of electronic platforms.

Plaintiffs allege generally that Defendants refused to supply Crop Inputs to FBN. *Id.* ¶¶ 65, 67. But they do not allege any requests by FBN for supply in the United States (the relevant geographic market alleged by Plaintiffs), nor do they allege when Defendants supposedly refused to supply those products, or the reasons given for the alleged refusal. Plaintiffs claim that "Defendants imposed strict penalties on retailers who failed to comply" with the supposed boycott, but the only specific action offered to support this statement is an act by a single Manufacturer Defendant that is consistent with its rational independent business behavior: an audit conducted by Defendant Syngenta in March 2018 of its own authorized retailers and brokers, arising out of

its "concerns about product integrity, stewardship, and regulatory compliance." *Id.* ¶ 68. Although Plaintiffs allege that other Manufacturer Defendants included language in their form contracts permitting similar audits, they do not allege that the intent of including the audit provisions was to impede any electronic platform, that their inclusion occurred after market entry by any electronic platform, or that any other Defendant exercised its audit rights. *Id.* ¶ 69. Plaintiffs allege that a Syngenta employee "question[ed]" the quality of products sold online and raised the concern of the potential for "counterfeit products." *Id.* ¶ 66. Plaintiffs summarily dismiss this concern as "false" (*id.*), but there is no support for that conclusion, nor any allegation that Syngenta's concern was not justified or rational.

Many of Plaintiffs' allegations regarding the purported boycott relate to events that occurred in Canada, outside of the United States market alleged in the Complaint, and have no alleged impact on Plaintiffs or putative class members. Plaintiffs allege that FBN purchased a Canadian retailer, Yorkton Distributors Ltd., which had "decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield." *Id.* ¶ 72. Plaintiffs allege that Defendant Federated, a Canadian company, declared that it, and "likely all of [its] traditional retailing partners across Western Canada," would "closely observe[]" the entry of FBN into the Canadian market. *Id.* ¶ 74. Plaintiffs also allege that after the Yorkton purchase, Bayer, Corteva, and Cargill informed FBN that it "would no longer sell Crop Inputs" to Yorkton (*id.* ¶ 76), and that Wholesaler Defendant Univar "emailed retailers saying that it would refuse to supply its products to Yorkton or FBN, and warning that the new competition would decrease profit margins in the industry" (*id.* ¶ 75). Plaintiffs do not (and cannot) allege that Yorkton could have sold products to Plaintiffs or others in the United States, nor do they allege that any other Defendant stopped supplying Crop Inputs to Yorkton. They also do not explain how any purported limitation

on sales of Canadian Crop Inputs to FBN could have an effect on the market for U.S. Crop Inputs. Plaintiffs further allege that the Canadian Competition Bureau "is formally investigating Defendants" (*id.* ¶ 89), and that the U.S. Department of Justice is "monitoring" that investigation (*id.* ¶ 92). Notably, the Complaint does not allege that any antitrust authority has taken enforcement action against any Defendant in any jurisdiction, let alone in the United States.

## V.   DEFENDANT-SPECIFIC ALLEGATIONS

Plaintiffs offer only the following sparse allegations specific to each Defendant:

### A.   Manufacturer Defendants

**Bayer CropScience LP & Bayer CropScience Inc.:** Plaintiffs allege that "Bayer"—without specifying which Bayer entity—maintains contracts with the other non-Manufacturer Defendants and includes audit rights in its contracts. *Id.* ¶¶ 30–39, 69. There is no allegation as to when those rights were first put in its contracts or whether those rights have been exercised. Plaintiffs also allege that "in 2016, Defendant Bayer secretly formed an internal task force specifically to study the long-term competitive impact of FBN's electronic platform." *Id.* ¶ 58. In Plaintiffs' discussion of the Canadian market, the Complaint also pleads that "Bayer" (presumably referring to a Canadian entity, as neither named Bayer Defendant sells Crop Inputs in Canada—indeed, the U.S.-based Defendant Bayer CropScience Inc. does not even sell Crop Inputs at all) had contracts with Yorkton pre-FBN acquisition, and informed FBN post-acquisition that it would no longer sell Crop Inputs to Yorkton. *Id.* ¶¶ 72, 76.

**BASF Corporation:** Plaintiffs allege that BASF maintains contracts with the other non-Manufacturer Defendants and contains language in its form contracts with authorized retailers that allow it to "audit authorized retailers' books and records and perform on-site inspections at any time." *Id.* ¶ 69. There is no allegation as to when those rights were first put in its contracts or whether those rights have been exercised. Plaintiffs allege that a separate BASF Canadian entity

is subject to an investigation in Canada. *Id.* ¶ 89. Plaintiffs also assert that CropLife America's Board of Directors is chaired by an executive of BASF. *Id.* ¶ 84.

**Corteva Inc.:** Plaintiffs allege that Corteva "refused to supply" its "Pioneer corn seed" to FBN, and that its contracts with unspecified "authorized retailers" allow it to audit those retailers and perform "on-site inspections." *Id*. ¶¶ 67, 69. There is no allegation as to when those rights were first put in its contracts or whether those right have been exercised. Plaintiffs allege that a Corteva affiliate did not supply to Yorkton in Canada after FBN bought it, yet they provide no detail as to which products. *Id*. ¶ 76. Plaintiffs mention that a Corteva executive was on the Board of CropLife America at some unspecified time. *Id*. ¶ 84. Plaintiffs provide no allegations of any conduct at all as to Defendant Pioneer Hi-Bred International, a subsidiary of Corteva.

**Syngenta Corporation:** Plaintiffs allege that Syngenta maintains contracts with the other non-Manufacturer Defendants. Plaintiffs allege that Syngenta did not supply FBN with Syngenta's Force insecticide (*id.* ¶ 67) and initiated an audit of its authorized retailers and brokers (*id.* ¶ 68). Plaintiffs further allege that a Syngenta employee "falsely claimed that electronic platforms would deliver counterfeit products." *Id.* ¶ 66.

### B.   Wholesaler Defendants

**Cargill, Incorporated:** Plaintiffs' Complaint does not contain any substantive allegations concerning the named Defendant, Cargill, Incorporated, which has not had a U.S. Crop Inputs business since September 2016. Instead, the Complaint's few allegations concerning any conduct by "Cargill" (*id*. ¶¶ 76, 89–90) refer to Cargill's Canadian affiliate, which has not been named as a defendant in this action.

**Univar Solutions, Inc.**: Plaintiffs' Complaint does not contain any substantive allegations concerning the named Defendant, Univar Solutions Inc. Instead, Plaintiffs' allegations focus on

the actions of Univar Canada, Ltd., a separate entity from Defendant Univar Solutions and not a named Defendant in this action. *See id*. ¶¶ 75, 89–90.

**Winfield Solutions, LLC**: Plaintiffs allege that FBN purchased Yorkton, a Canada-based retailer that had a supply agreement with Winfield. *Id*. ¶ 72. There are no other allegations regarding Winfield's supply relationship with that retailer, let alone any allegation regarding Winfield's conduct in the United States. Plaintiffs also allege that the Canadian Competition Bureau is investigating the conduct of Winfield United Canada ULC, but that is a separate entity from Defendant Winfield and not a named Defendant in this action.

### C.    Retailer Defendants

**CHS Incorporated:** Plaintiffs allege that CHS distributed a letter to its profit-sharing farmer-owners attempting to "discourage them from using FBN." *Id*. ¶ 57. There are no allegations that CHS agreed with any Defendant to send this marketing letter. Plaintiffs further allege that an executive of CHS formerly served on the board of CropLife America. *Id*. ¶ 84. There are no other allegations regarding CHS.

**Federated Co-operatives Limited:** Plaintiffs allege that Federated, a Canadian cooperative operating exclusively in Canada, wrote about FBN's acquisition of Yorkton, a Canadian retailer, that "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." *Id*. ¶ 74. Plaintiffs further allege that Federated is under investigation by the Canadian Competition Bureau. *Id*. ¶¶ 39, 89. Plaintiffs do not allege that Federated has any operations in the United States.

**GROWMARK, Incorporated:** Plaintiffs allege that GROWMARK is an agricultural supply cooperative, and that Gateway FS Inc. (from which Plaintiff Piper purchased Crop Inputs)

is a member-owner of GROWMARK.[7] *Id.* ¶ 16. Plaintiffs allege that GROWMARK maintains distribution contracts with the Manufacturer Defendants (*id.* ¶ 36) and that GROWMARK employees serve or served on the boards of CropLife America and the Agricultural Retailers Association ("ARA") (*id.* ¶¶ 84–85).[8]

**Nutrien Ag Solutions, Incorporated:** Plaintiffs mention Nutrien in two introductory paragraphs of the Complaint, alleging that it operates in the marketplace as a wholesaler and the "largest Crop Inputs Retailer in the United States" and maintains the same kind of business contracts as the other defendants. *Id.* ¶¶ 2, 35. There are no other allegations regarding Nutrien.

**Simplot AB Retail Sub, Incorporated:** Plaintiffs merely assert that Simplot operates in the marketplace and has certain contracts. *Id.* ¶¶ 20, 38. Plaintiffs further allege an executive of Simplot formerly served on the board of CropLife America. *Id.* ¶ 84.

**Tenkoz, Incorporated:** Plaintiffs mischaracterize Tenkoz as a "retailer" (*id.* ¶ 2) and merely allege that an executive of Tenkoz formerly served on the board of CropLife America (*id.* ¶ 84).

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege a violation of the antitrust laws and plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To allege a plausible conspiracy in

---

[7] Although the details vary by cooperative, an agricultural supply cooperative is generally owned in large part by its customers, is governed by its customers, and is operated for the benefit of its customers—who are also supposedly members of the Plaintiff class.

[8] The *Swanson* case caption identifies GROWMARK FS, LLC as a Defendant but no other case caption does. There are no factual allegations against GROWMARK Inc.'s subsidiary GROWMARK FS, LLC and the Complaint should therefore be dismissed as to GROWMARK FS, LLC.

violation of Section 1 of the Sherman Act, a complaint must plead "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. An antitrust plaintiff must plead "evidentiary facts" that sustain a "plausible" inference of an unlawful agreement, including the "who, did what, to whom (or with whom), where, and when." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 n.6 (9th Cir. 2015). Indiscriminately lumping defendants together by "group pleading" does not meet this standard. To the contrary, such allegations are insufficient at the motion to dismiss stage because "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of Am.*, 725 F.3d at 818. And, in antitrust cases where the costs of discovery are typically "enormous," courts must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558–59.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE CONSPIRACY TO BOYCOTT ELECTRONIC PLATFORMS

Plaintiffs allege no facts evidencing a conspiracy—no facts are pled as to the "who, what, where, when" of any agreement or even of any improper competitor communications. Plaintiffs instead ask this Court to *infer* a conspiracy, among 16 separate entities, to boycott "electronic platforms" based on conduct that is consistent with independent, lawful market behavior. Unlike the "classic anticompetitive group boycott," which involves "a concerted action by competitors at one level to protect themselves from competition by non-group members," *Allied Int'l, Inc. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 640 F.2d 1368, 1380 (1st Cir. 1981), Plaintiffs' alleged conspiracy implicates market participants at *three* levels of the distribution chain—manufacturers, wholesalers, and retailers. *See* Compl. ¶¶ 2, 22–39. The Seventh Circuit requires that "where the plaintiffs allege that participants in a market at different levels of the distribution chain entered

- 14 -

into a conspiracy, the plaintiffs must show that similarly situated members of the conspiracy coordinated not only with the manufacturer, *but also with each other*." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841–42 (7th Cir. 2020) (emphasis added).

The Complaint must be dismissed because Plaintiffs fail to satisfy their burden of pleading *any* agreement to conspire, much less the existence of any horizontal agreement among competitors at any level of the distribution chain, or any vertical agreement to boycott. Contrary to the requirements under Seventh Circuit caselaw, Plaintiffs' conspiracy allegations lump Defendants together without identifying what each Defendant allegedly did to enter the group boycott. The allegations specific to certain Defendants are sparse, and even as to those, the conduct was the result of "rational, commercially motivated" activity that this Court and others have held is simply not enough. *Marion Diagnostic Ctr. LLC v. Becton, Dickinson & Co.*, No. 3:18-CV-1059, 2021 WL 961728, at *4 (S.D. Ill. Mar. 12, 2021) (Rosenstengel, C.J.) (dismissing complaint where allegations were evidence of "rational, commercially motivated" activity, not anticompetitive conspiracy).

To the extent Plaintiffs purport to allege vertical agreements (*i.e.*, the existence of "authorized retailer" agreements between Manufacturer and Retailer Defendants), the claims must still be dismissed for failure to plead a relevant market and any Defendant's (or group of Defendants') market power within that market. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (to plead an unlawful restraint under the rule of reason, a plaintiff must plausibly allege "an anticompetitive effect on a given market within a given geographic area . . . show[ing] that the defendant has market power . . . without which the defendant could not cause anticompetitive effects on market pricing"). As set forth herein, there are no facts alleged

- 15 -

indicating that any Defendant, or all Defendants together, have market power in any properly defined relevant market.

### A.   Plaintiffs Rely on Impermissible Group Pleading, Without Pleading the Requisite Specifics as to Each Defendant's Participation in the Alleged Conspiracy

The Complaint fails at the outset because Plaintiffs do not adequately plead the link between any single Defendant and the alleged conspiracy to boycott electronic platforms. The Complaint states that "Defendants," as an undifferentiated group, initiated a group boycott. *See, e.g.*, Compl. ¶¶ 65–66, 68. Nowhere, however, does the Complaint allege the details concerning how and when *each* Defendant entered into and participated in the alleged conspiracy to boycott electronic platforms. For some Defendants, the Complaint alleges no specific conduct at all. Such "[g]eneric pleading, alleging misconduct against defendants without specifics as to the role each played *in the alleged conspiracy*, was specifically rejected by *Twombly*." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435–36 (6th Cir. 2008) (emphasis added). The Seventh Circuit mandates that "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful," and absent such a showing, "[a] complaint based on a theory of collective responsibility *must be dismissed*." *Bank of Am.*, 725 F.3d at 818 (emphasis added); *see also Alexander v. Phx. Bond & Indem. Co.*, 149 F. Supp. 2d 989, 1000 (N.D. Ill. 2001) ("We will analyze each defendant individually because, even in a conspiracy case, liability remains individual and is not a matter of mass application."). Accordingly, in order to avoid dismissal at the pleading stage in a boycott case such as this one, Plaintiffs must specifically link each individual Defendant to the boycott by "provid[ing] *each [d]efendant* with 'fair notice of what the claim is and the grounds on which it rests,' including the *factual connection of that defendant* to the scheme and the identity of its alleged co-conspirators." *Tera Grp. Inc. v. Citigroup, Inc.*, No.

17 CIV. 4302, 2019 WL 3457242, at *11 (S.D.N.Y. July 30, 2019) (emphasis added and citation omitted). The Complaint fails to do so with respect to any Defendant.

### B.   Plaintiffs Fail to Plead a Plausible Conspiracy Through Either Direct or Circumstantial Evidence

The Complaint also fails because Plaintiffs do not adequately plead their antitrust conspiracy through either direct evidence of the conspiracy or through circumstantial evidence, which requires sufficient factual allegations of both "parallel conduct," and "plus factors" or "something more." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010); *Twombly*, 550 U.S. at 556.

### 1.   Plaintiffs Allege No Direct Evidence of a Conspiracy

Plaintiffs allege no facts that amount to direct evidence. Direct evidence is evidence that is "tantamount to an acknowledgment of guilt." *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661–62 (7th Cir. 2002); *see also In re Local TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *7 (N.D. Ill. Nov. 6, 2020) (it "is equivalent to a 'smoking gun'"). Nothing in the Complaint points to a meeting, person, or other fact suggesting that any combination of Defendants entered into any agreement. Although the Complaint includes general, conclusory allegations that "Defendants conspired," as noted above, such allegations are insufficient to state a claim. *See Bank of Am.*, 725 F.3d at 818.

### 2.   Plaintiffs Allege Only Parallel Conduct that Is Equally Consistent with Independent Responses to FBN's Entering the Market

Lacking any allegations of direct evidence of a conspiracy, Plaintiffs attempt to plead their case entirely through circumstantial evidence. To properly plead a circumstantial case, Plaintiffs must allege both (1) parallel conduct; and (2) additional "plus factors" that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 553, 556–57; *see also In re Text Messaging*, 630 F.3d at 627

(parallel behavior is that which appears "anomalous in a competitive market"). Plaintiffs fail on both counts.

Parallel conduct suffices to raise a plausible Sherman Act § 1 claim only if there are well-pleaded allegations showing that the conduct "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 556 n.4. "[A] complaint that merely alleges parallel behavior alleges facts that are equally consistent with an inference that the defendants are conspiring and an inference that the conditions of their market have enabled them to avoid competing without having to agree not to compete." *In re Text Messaging*, 630 F.3d at 627. Here, the Complaint must be dismissed because, as a threshold matter, there are no *specific* allegations that each Defendant engaged in the same conduct with respect to the alleged U.S. market. Instead, Plaintiffs cite to a few *unilateral* and *dissimilar* actions taken by certain Defendants (or third parties)—behavior that is not parallel at all.

The sum total of Plaintiffs' specific allegations of actions attributed to individual Defendants in the United States is the following:

- retailer CHS distributed a letter to its profit-sharing farmers-owners discouraging them from using with FBN (Compl. ¶ 57);

- manufacturer Bayer formed an internal task force to study the competitive impact of electronic platforms (*id.* ¶ 58);

- a Syngenta employee stated that some of the products sold on electronic platforms might be counterfeit goods (*id.* ¶ 66);

- Syngenta refused to sell its Force Insecticide to FBN (*id.* ¶ 67);

- Corteva refused to sell its Pioneer corn seed to FBN (*id.* ¶ 67); and

- Syngenta audited authorized retailers and brokers, and expressed concern about FBN's "product integrity, stewardship, and regulatory compliance" (*id.* ¶ 68).

- 18 -

Each of these allegations reflects *different*, unilateral reactions by individual Defendants to the emergence of electronic platforms—and *none* implies the existence of an illegal conspiracy. Indeed, as to most Defendants (Manufacturer BASF; Wholesalers Winfield, Univar, and Cargill; and Retailers Federated, GROWMARK, Nutrien, Simplot, and Tenkoz), Plaintiffs do not allege *any* specific United States conduct.

Unable to plead parallel conduct that could give rise to an inference of a conspiracy, Plaintiffs attempt to rely on alleged conduct by one Defendant in Canada, a wholly distinct and separate market. That fails for multiple reasons. Allegations of foreign conduct, even if proved, would not support the existence of a conspiracy on behalf of the named Defendants in the United States. *See, e.g.*, *In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 391 (S.D.N.Y. 2019) (dismissing complaint relying on government investigations that "state nothing about wrongdoing *on behalf* of Defendants here" (emphasis in original)); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 403 (3d Cir. 2015) ("A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy, especially when the conduct observed domestically is just as consistent with lawful interdependence as with an antitrust conspiracy. To hold otherwise would sanction the use of unabashed propensity reasoning."). But Plaintiffs have not alleged parallel conduct even in Canada sufficient to support an inference of a conspiracy.

Plaintiffs allege that FBN acquired Yorkton, a Canadian retailer with "decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield." Compl. ¶ 72. Plaintiffs claim that Manufacturer Defendants "Bayer, Corteva, and Cargill [sic] informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, to Yorkton." *Id.* ¶ 76; *see also id.* ¶ 77 (describing this conduct as a "boycott in the Canadian market"). Even if deemed true, the mere fact that three sellers in Canada declined to continue sales to Yorkton, standing alone, is

not evidence of a conspiracy among any Defendants in Canada. Plaintiffs do not allege that other Defendants ceased doing business with Yorkton, and thus Plaintiffs do not plead relevant parallel conduct even in Canada.[9] Plaintiffs also claim that "Univar" announced that it would cease doing business with FBN/Yorkton (*id.* ¶ 75), but Plaintiffs later identify Univar Canada Ltd.—which is *not* a named Defendant—as a party under investigation in Canada for the supposed boycott of FBN/Yorkton. *See id.* ¶ 89. In any event, Plaintiffs allege no facts showing that any decision by a named Defendant or other entity was pursuant to any agreement with any other Defendant, and Plaintiffs do not allege that any other Defendant made a similar announcement. *Id.* ¶¶ 75, 118, 57.

At bottom, there are no allegations sufficient to show that Defendants acted in a concerted manner in the United States or anywhere else, much less that they did so in furtherance of the alleged conspiracy. As discussed further *infra*, even if Plaintiffs could show that Defendants engaged in parallel conduct by refusing to sell products to electronic platforms, doing so would be entirely consistent with each Defendants' legitimate and independent business rationales.

### 3.     Plaintiffs Fail to Allege Plus Factors Suggestive of a Conspiracy

Because Plaintiffs fail to plead any relevant parallel conduct, and indeed plead facts that undermine a plausible conspiracy, "no discussion of any 'plus factors' is necessary," and the Complaint should be dismissed. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516–17 (8th Cir. 2018); *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, No. 16-CV-10324, 2020 WL 1666454, at *9 n.8 (N.D. Ill. Apr. 3, 2020) ("[B]ecause the [complaint] does not

---

[9] Plaintiffs' use of generic corporate family names, *e.g.*, "BASF," "Syngenta," "Corteva," "Univar," and "Bayer" is misleading. Plaintiffs must identify the precise legal entities engaged in the behavior alleged and cannot attribute the alleged conduct of Canadian entities to American entities simply by grouping them together. *See In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d at 390–91.

even allege facts to plausibly infer parallel conduct by the defendants . . . even if the 'plus-factors' did strengthen the plaintiffs' claim, they still would not be enough to meet the bar set by *Twombly*"); *In re Pork Antitrust Litig.*, No. 18-1776, 2019 WL 3752497, at *7 (D. Minn. Aug. 18, 2019) ("[P]lus factors without plausible allegations of parallel conduct are insufficient to establish an inference of an agreement."). Nonetheless, Plaintiffs' claims also fail because Plaintiffs have not sufficiently alleged the requisite plus factors suggesting an anticompetitive conspiracy rather than lawful unilateral behavior. *Twombly*, 550 U.S. at 556–57.

Plaintiffs offer the following alleged plus factors: (i) Defendants' conduct was against their independent self-interest; (ii) opportunities to conspire; (iii) concentration in the "Crop Inputs market"; (iv) certain government investigations; and (v) prior antitrust violations. However, none of the facts alleged in support of these plus factors indicate conspiracy, and most demonstrate lawful, independent economic behavior.

### i.   *Defendants' Reactions to Electronic Platforms Was Predictable and Not Contrary to Their Alleged Self-Interest*

Plaintiffs speculate that absent an agreement among Defendants to boycott electronic platforms, Defendants' alleged refusals to deal with electronic platforms were against each Defendant's independent economic self-interests because the platforms: (1) represented well-financed customers ready to buy in bulk; (2) would simplify the distribution channel by eliminating incentive programs and other costs to wholesalers and retailers; and (3) presented an opportunity to expand sales on a nationwide basis, rather than where authorized retailers are located. Compl. ¶ 88. But Plaintiffs' speculation is unfounded, contradicted by other allegations in the Complaint and judicially noticeable facts, and contrary to common sense. As detailed below, it would be entirely consistent with their self-interest for Defendants at each level of the distribution chain—retail, wholesale, and manufacturing—to choose independently not to deal with the electronic

platforms, as they are free to do under the antitrust laws. *See United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919) ("[T]he [Sherman Act] does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal . . . .").

   *Retailers:* It makes sense that a retailer would choose not to deal with a new rival that intends to compete with it. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407–08 (2004) (recognizing that forcing a company to share its advantage with its rival is "in some tension with the underlying purpose of antitrust law," especially because "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion"); *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009). Plaintiffs allege that FBN's presence in the marketplace had the "potential to significantly disrupt traditional Crop Inputs supply and pricing." Compl. ¶ 55. Given this allegation, "each [Defendant] had good reason to independently discourage . . . and not encourage . . . development of a new trading paradigm that threatened, someday, to cannibalize their [] profits." *In re IRS*, 261 F. Supp. 3d at 464. Moreover, Plaintiffs assert that Crop Input retailers' margins were minimal; if so, the Retailer Defendants unsurprisingly would not welcome another competitor. Compl. ¶ 59 ("*Already low margins* were about to race to the bottom." (emphasis added)); *id.* ¶ 61 ("FBN had negatively affected their businesses during 2017 by cutting into their *already slim margins* on various products." (emphasis added)). And Defendant CHS is a retailer cooperative that is *owned by farmers*—and thus its profits are shared with the farmers—so naturally CHS and its farmer-owners

have an interest in CHS's continued sales and profitability, and not diverting sales to a competitor.[10]

*Wholesalers:* The alleged reactions of Wholesaler Defendants were likewise consistent with independent market conduct. First, like CHS, certain wholesalers are also cooperatives that are owned by their retail customers.[11] Naturally cooperatives and their owners might not want to divert sales to a competitor. It also thus makes sense that any combined wholesaler/retailer would have little interest in supporting a new retail market entrant that sought to cut into its retail business profits. Indeed, courts have recognized that a cooperative's efforts to encourage purchases by its owners do not imply a conspiracy. *See, e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F. Supp. 2d 696, 719 (E.D. La. 2013) (dismissing allegations against buying group where plaintiff failed to meet federal pleading requirements because "parallel conduct in imposing minimum purchase requirements on buying groups [did] not give rise to a strong inference of conspiracy"); *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, No. 18 Civ. 11932, 2019 WL 1949801, at *1, 7 (S.D.N.Y. Apr. 17, 2019) (refusing to enjoin defendant "member organization comprising up of over 70,000 members" from enforcing exclusivity clauses because defendants presented

---

[10] *See, e.g.*, CHS, Inc., Annual Report (Form 10-K), at 1 (Nov. 5, 2020), *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/823277/000082327720000034/chscp-20200831.htm ("CHS FY2020 10-K") ("Our earnings from cooperative business are allocated to members . . . based on the volume of business they do with us. We allocate these earnings to our patrons in the form of patronage refunds."). Plaintiffs' own quote from the CHS letter references this profit-sharing relationship, noting that FBN does not "return[] any profits to you the farmer." Compl. ¶ 57. Pursuant to Federal Rule of Evidence 201, the Court may take judicial notice of CHS's farmer ownership structure, which is described and disclosed in various CHS public filings. *See, e.g.*, CHS FY2020 10-K at 1 ("As a cooperative, we are owned by farmers and ranchers and their member cooperatives (referred to herein as "members") across the United States.").

[11] *See, e.g.*, Compl. ¶ 16 (alleging that GROWMARK, Inc. is a cooperative).

- 23 -

"plausible procompetitive effects . . . such as increased deal-making efficiency and the elimination of free-riding").

Significantly, Plaintiffs also allege that FBN sought to cut out wholesalers from the chain of distribution, so naturally no wholesaler would see FBN as a welcome addition to the marketplace. *See* Compl. ¶¶ 72–73, 76 (describing FBN's purchase of a retailer in Canada and attempt to purchase product directly from manufacturers); *see also id.* ¶ 5 (alleging purpose of electronic platforms was to "circumvent[]" the distribution system involving wholesalers and retailers).

The Complaint alleges, without naming any specific entity, that the Retailer and Wholesaler Defendants responded to the entry of electronic platforms by encouraging the Manufacturer Defendants not to deal with them. *Id.* ¶ 64. But courts have stated firmly that complaints by distributors and retailers to their suppliers about their rivals, even if acted upon, do not indicate an antitrust conspiracy. "Complaints about price-cutters are natural—and from the manufacturer's perspective, unavoidable—reactions by distributors to the activities of their rivals." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) (internal citations omitted); *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 449 (7th Cir. 2007) (same). Such complaints "arise in the normal course of business and do not indicate illegal concerted action." *Monsanto*, 465 U.S. at 763 (citation omitted); *see also, e.g.*, *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 WL 6845862, at *5 (N.D. Ill. Dec. 4, 2014) (dismissing complaint where allegations of complaints from other retailers were insufficient to plausibly suggest group boycott among retailers); *Ben Sheftall Distrib. Co. v. Mirta de Perales, Inc.*, 791 F. Supp. 1575, 1580–81 (S.D. Ga. 1992) (allegations of complaints from other distributors were insufficient to state a claim based on alleged price-fixing agreement).

- 24 -

*Manufacturers:* Plaintiffs themselves acknowledge reasons why manufacturers would prefer to deal with established business partners rather than new entrants with new business models. As the Complaint notes, Syngenta had legitimate "concerns about product integrity, stewardship, and regulatory compliance" for FBN sales. Compl. ¶ 68. Similarly, Corteva stated, in the Wall Street Journal article cited in the Complaint, that the "existing dealers, distributors and retailers make sure farmers get reliable products with the best results, and any new sellers would need to meet those standards." Jacob Bunge, *Tech Startup, Trying to Be Amazon for Farms, Runs Into Ag Giants*, Wall Street J., Aug. 30, 2020, *available at* https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850 (referenced at Compl. ¶¶ 57, 68, 73–74, 76). Plaintiffs thus concede that manufacturers rely on wholesalers and retailers to provide services and value-added services to consumers, and it is entirely rational that manufacturers would choose not to deal with retailers (like electronic platforms) whose business model is to lower prices by dispensing with value-added sales-related services. *See Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 55 (1977) (recognizing that "service and repair are vital for many products" and that the quality of such services affect a "manufacturer's goodwill and the competitiveness of his product").

Indeed, Crop Inputs are highly specialized products. Some, such as insecticides and herbicides, are hazardous if not handled and used appropriately. It is therefore in a manufacturer's interest "to exert control over the manner in which [its] products are sold and serviced" (*id.* at 55 n.23), especially given the manufacturers' vast expenditures on research and development and the consequent need to maintain the integrity of their products. "As a result of statutory and common-law developments, society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products . . . . The legitimacy of these concerns has been

recognized in cases involving vertical restrictions." *Id.*[12] For these reasons, a manufacturer is free to choose its own preferred system of distribution. *Dunnivant v. Bi-State Auto Parts*, 851 F.2d 1575, 1580–81 (11th Cir. 1988) ("It is well established that a merchant, whether he be a manufacturer, distributor, wholesaler, or retailer, may choose with whom he will do business and with whom he will not do business; such action generally does not violate the antitrust laws.") (citation omitted); *Colgate*, 250 U.S. at 307.

### ii.     *Defendants' Alleged Opportunities to Conspire Are Nothing More than Routine Trade Association Involvement*

Plaintiffs next allege that seven of the 16 Defendants' general involvement in trade associations is a plus factor because trade associations create an "opportunity to conspire." Compl. ¶¶ 82–85.[13] But "[m]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987) (quoting T. Vakerics, Antitrust Basics, § 6.13 at 6-37 to -38 (1985)). "There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order

-------

[12] Stewardship, and the regulatory schemes in effect to ensure stewardship, are indeed fundamental to the seed and pesticide industries. *See, e.g.*, 505 Ill. Comp. Stat. 110, Illinois Seed Law (requiring that sellers of seed obtain annual permits to sell in Illinois, requiring that the product be subject to the inspection and analysis of the Department of Agriculture, and permitting the Department's Director to enter private premises to conduct such inspections); 415 Ill. Comp. Stat. 60/4, Illinois Pesticide Act (same as to pesticides). Manufacturers of Crop Inputs have legitimate interests in exercising discretion over who can comply with the applicable regulatory frameworks, and otherwise tend to seed performance issues, chemical resistance issues, and the other services that local retailers provide.

[13] Bayer CropScience LP, Cargill, GROWMARK FS, LLC, Federated, Nutrien, Pioneer Hi-Bred International, Syngenta, Univar, and Winfield are not alleged to have been members of a trade association.

to establish a violation of the antitrust laws by a particular association member." *Id*.; *see also Tichy v. Hyatt Hotels Corp*, 376 F. Supp. 3d 821, 840 (N.D. Ill. 2019).

When courts have found this plus factor adequately pled, there were far more facts indicating that trade associations were a forum for anticompetitive conduct. For example, in *In re Text Messaging*, the Seventh Circuit cited allegations that defendants "exchanged price information directly" at trade association meetings and that certain defendants met within a sub-group of the association where they "urge[d] its members to substitute 'co-opetition' for competition." 630 F.3d at 628. In contrast, where plaintiffs allege in a conclusory fashion that "membership in industry associations and attendance at industry conferences are indicia of an agreement," such allegations "will not nudge an allegation from the realm of parallelism to the land of agreement." *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 995 (W.D. Ark. 2017) (distinguishing *In re Text Messaging*, 630 F.3d at 628); *see also In re Musical Instruments*, 798 F.3d at 1196 ("[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement.").

Here, Plaintiffs merely allege that employees of certain Defendants serve, or have served, on the boards of directors of CropLife America and the ARA, and note also that the Manufacturer Defendants sponsored the ARA's 2019 conference. Compl. ¶ 85. Critically absent is any assertion about whether and to what extent these employees met or otherwise communicated about any alleged conspiracy. The only specific conduct alleged to have taken place at a trade association gathering was that certain unidentified members of CropLife America's PACE Advisory Council voiced concerns about FBN during a 2017 meeting. *Id*. ¶¶ 61, 85. Expressing concerns—even by

alleged conspirators—about a competing seller is a far cry from discussing (or agreeing to) a group boycott. *See Monsanto*, 465 U.S. at 763.[14]

### iii. *Market Concentration Is Not a Plus Factor Because Plaintiffs Have Not Adequately Pled That Any Market Is Concentrated*

Plaintiffs allege in a conclusory manner that "[t]he market for Crop Inputs is highly concentrated." Compl. ¶ 81. Even if this allegation was credited, market concentration "(even combined with parallel conduct) cannot sustain plaintiffs' complaint all on its own." *Wash. Cnty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 841 (N.D. Ill. 2018). Indeed, as recognized in *Twombly*, a "common reaction of firms in a concentrated market" is to "recogniz[e] their shared economic interests," and reach similar decisions independently; "[t]hus, even if the alleged market were concentrated, this would not render the asserted conspiracy plausible." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014) (quoting *Twombly*, 550 U.S. at 553); *see also In re Dynamic Random Access Memory Indirect Purchaser Litig.*, No. 4:18-CV-2518, 2020 WL 8459279, at *10 (N.D. Cal. Nov. 24, 2020) ("[C]oncentrated markets also make parallel unilateral conduct *more* plausible, and thus cannot raise an inference of conspiracy." (emphasis added)).

In any case, Plaintiffs fail to plead facts indicating the existence of a "Crop Inputs market," much less that any such market is concentrated. There are myriad different products alleged to be

---

[14] Indeed, it is difficult to square Plaintiffs' allegation that Defendants' participation in trade organizations such as CropLife America was a forum to facilitate a group boycott of FBN, *see* Compl. ¶¶ 83–86, with the undisputed (and conspicuously omitted) fact that *FBN itself* is a member of that very organization. *See* "Member Companies," *available at* http://www.croplifeamerica.org/members (listing FBN Inputs LLC among CropLife America members); *United States v. Kmart Corp.*, No. 12-CV-881, 2014 WL 11696711, at *2 (S.D. Ill. Sept. 26, 2014) (court can take judicial notice of the contents of a website when not subject to reasonable dispute).

part of the Crop Inputs Market—thousands of seeds for different crops, herbicides, insecticides, fungicides, fertilizers—which are clearly not interchangeable and thus cannot constitute a relevant product market. *See Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916–17 (7th Cir. 2020) ("A 'relevant market' under the Sherman Act is comprised of the 'commodities reasonably interchangeable by consumers for the same purposes.'") (citation omitted). Similarly, Plaintiffs claim that the geographic market is national (Compl. ¶ 43), but fail to explain why a farmer in Nebraska would look to a retail store in Alabama for its supply of seeds and pesticides. Indeed, the Complaint acknowledges that the market has historically operated in local markets. *See, e.g.*, Compl. ¶¶ 79, 88.[15]

Nor do Plaintiffs adduce any facts indicating that any purported market is in fact "concentrated." Most importantly, Plaintiffs say *nothing* about concentration at the retailer level— the level at which the Plaintiffs and their putative classes made their purchases and the level at which FBN competed. While Plaintiffs allege that one "retailer" sells 25% of all crop protection *chemicals* sold in the U.S. (*id.* ¶ 37), they plead nothing about seeds, and they plead nothing about any of the other Retailer Defendants' share of the various markets for Crop Inputs. No fact pled in the Complaint suggests that the retail market for Crop Inputs is anything other than competitive— indeed, the Complaint indicates that margins are thin at the retail level (*id.* ¶ 61), which indicates a highly competitive marketplace.

As to the wholesalers, Plaintiffs generally allege that "seven wholesalers" account for 70% of unspecified "sales volume," but they do not indicate who those wholesalers are, and whether

---

[15] As noted *supra* Argument, Section I, Plaintiffs' failure to properly allege (with sufficient facts) a relevant market and market power by Defendants means that Plaintiffs have not adequately pled a claim based on any vertical agreement among any Defendants—or, for that matter, any horizontal agreement or the broad conspiracy alleged in the Complaint. *Agnew*, 683 F.3d at 335.

any of the three Wholesaler Defendants are among them. *Id*. ¶ 81. Seven wholesalers accounting for 70% of sales is hardly concentrated, and there could be dozens of wholesalers that occupy the remaining 30%.

The allegations as to the manufacturers are equally obscure. Plaintiffs only allege that the Manufacturer Defendants account for "85% of the corn seed market, more than 75% of the soybean seed market, and over 90% of the cotton seed market." *Id*. ¶ 81. But those "markets" are not the Crop Inputs market alleged in the Complaint, and one cannot draw any conclusion as to whether the market alleged in the Complaint is concentrated at all from allegations addressing only three seed products in the entire broad universe of "Crop Inputs." *See id*. ¶ 1 (defining Crop Inputs as "seeds and crop protection chemicals such as fungicides, herbicides, and insecticides").

> ### iv.  *Government Investigations Against a Subset of Defendants Does Not Render the Allegations Any More Plausible*

Plaintiffs next refer to government investigations against certain Defendants. These allegations merit no weight as a plus factor.

First, Plaintiffs refer to an investigation by the Canadian Competition Bureau of "Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC." Compl. ¶ 89. But only *one* of these entities, Federated, is a named Defendant, and Plaintiffs fail to link Federated, a Canadian company, to any of the alleged conduct in the United States—yet another example of Plaintiffs' misleading group pleading that courts discredit. *See Bank of Am.*, 725 F.3d at 818. All are *Canadian* entities, except Corteva Inc. (which is not specifically alleged to be a subject of investigation but rather described ambiguously as "Corteva Inc. and/or its affiliates"). The Bayer CropScience Inc. entity referenced is not the

American entity of the same name included as a Defendant (*see* Compl. ¶ 23), but a Canadian entity, as reflected on Canadian government websites.[16]

While certain of the alleged subjects of the Canadian investigation are affiliates of the Defendants, those affiliates are separate and distinct legal entities, and courts have held that such corporate affiliation is not a basis to ascribe any actions to the Defendants here for purposes of pleading a plus factor. *See In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d at 391 (dismissing complaint relying on government investigations that "state nothing about wrongdoing *on behalf* of Defendants here" (emphasis in original)); *see also In re Chocolate Confectionary*, 801 F.3d at 403–04 ("[A] subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship.") (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44 (3d Cir. 2010)).

Significantly, the Complaint alleges only an investigation—not any finding of a violation. But even assuming (counterfactually) that a violation were found, courts have repeatedly rejected Plaintiffs' proposed reasoning of "if it happened there, it could have happened here." *Transhorn, Ltd. v. United Techs. Corp. (In re Elevator Antitrust Litig.)*, 502 F.3d 47, 52 (2d Cir. 2007); *In re Mex. Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d at 390 ("It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility."); *In re Chocolate Confectionary*, 801 F.3d at 403–04 (rejecting argument that one could infer U.S. conspiracy from Canadian Competition Bureau investigation evidence, even where the market involved similar participants);

---

[16] *See Notice of Submission from Monsanto Canada ULC* (Dec. 15, 2020), *available at* https://inspection.canada.ca/plant-varieties/plants-with-novel-traits/notices-of-submission/mon94100/eng/1607633138607/1607633252648;

*Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 921 (N.D. Cal. 2019) ("allegations of investigations or cases outside of the United States are fully unpersuasive").

Further, Plaintiffs do not allege, because they cannot, that the Canadian Competition Bureau is investigating CHS Inc., GROWMARK, Inc., GROWMARK FS, LLC, Nutrien, Simplot, Syngenta or Tenkoz, or any of their affiliates. Indeed, judicially noticeable documents[17] from the Canadian court proceedings list allegations relating only to affiliates of other Defendants.[18] Plaintiffs cannot plead around this reality through general allegations that the Canadian Competition Bureau is "investigating Defendants" (Compl. ¶¶ 90–92), or that its actions concern the "Manufacturer Defendants" (*id.* ¶¶ 76–77). This alleged "plus factor" is thus entirely inapplicable to CHS Inc., GROWMARK, Inc., GROWMARK FS, LLC, Nutrien, Simplot, Syngenta or Tenkoz.

Second, Plaintiffs refer to a disclosure by Corteva in a securities filing that it received a subpoena from the Federal Trade Commission seeking documents related to Corteva's sales of "crop protection products generally." *Id.* ¶ 92. Notably, neither Corteva's disclosure nor anything else indicates that the FTC is investigating any concerted conduct between Corteva and any other

---

[17] This Court can properly take judicial notice of filings in the courts of other countries. *See, e.g.*, *Color Switch LLC v. Fortafy Games DMCC*, 377 F. Supp. 3d 1075, 1089 n.6 (E.D. Cal. 2019), *aff'd*, 818 F. App'x 694 (9th Cir. 2020) (taking judicial notice of court documents from litigation in United Arab Emirates); *United States v. New-Form Mfg. Co.*, 27 C.I.T. 905, 917 n.14 (2003) (taking judicial notice of "Canadian court's bankruptcy records to establish the fact that [Defendant] has been adjudged bankrupt in Canada").

[18] *See* "Order to Produce Records and Make and Deliver Written Returns of Information (Sections 11(1)(b), 11(1)(c) and 11(2))," *Comm'r of Competition v. Winfield United Can. ULC*, T-156-20 (Ottawa, Ontario, Feb. 11, 2020) (granting government's request for production order as to Winfield United Canada ULC in connection with inquiry relating to "allegations that Federated Co-Operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned subsidiary Monsanto Canada ULC have engaged in practices reviewable under" Canada's competition law).

Defendant or other market participant, nor is there any suggestion that the investigation is related to electronic platforms.[19] Plaintiffs also do not plead that any other Defendant is subject to an FTC inquiry. Plaintiffs do not link the Corteva disclosure to the alleged conspiracy such that it makes the conspiracy more probable, nor is the disclosure itself evidence of any wrongdoing. *See Wash. Cnty. Health Care Auth.*, 328 F. Supp. 3d at 842 n.16 ("The mere fact that an investigation is being conducted says nothing about whether unlawful conduct has occurred. Investigations require no minimum predication or threshold of evidence to begin; indeed, the purpose of an investigation is to determine *whether* there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct." (emphasis in original)).

Finally, Plaintiffs allege that the U.S. Department of Justice is "monitoring" the "Canadian Competition Bureau's investigation and is deciding whether to launch its own investigation . . . ." Compl. ¶ 92. Plaintiffs' careful word-choice is notable because "monitoring" is not an investigation or legal proceeding. Putting aside whatever "monitoring" may mean, the fact that a government authority may be observing developments in an investigation in another jurisdiction is unremarkable. There is no reference to any DOJ subpoenas or an investigation. And, even if there had been, such facts would not serve as plus factors. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (holding that a DOJ investigation "carries no weight in pleading an antitrust conspiracy claim," especially when "[i]t is unknown whether the investigation will result in indictments or nothing at all").

---

[19] *See* Corteva, Inc. Quarterly Report (Form 10-Q), at 69 (Sept. 30, 2020), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001755672/12583253-558f-47b3-b077-4e1db92e787f.pdf. This Court can take "[j]udicial notice of historical documents, documents contained in the public record, and reports of administrative bodies." *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998).

**v.**   ***Prior Antitrust Violations Are Not Indicative of a Conspiracy***

Plaintiffs claim that three Defendants were identified by a third-party publication as "leading recidivists." Compl. ¶ 86. Putting aside the ambiguity in this allegation (which does not distinguish between legal entities or indicate any particular product, jurisdiction, or time period), it is inapposite. And Plaintiffs say nothing about the 13 other Defendants.[20] Notwithstanding Plaintiffs' assertions that unnamed "[c]ompetition experts have noted" this factor as relevant (*id.*), courts have held the opposite: evidence of prior violations is not indicative of a conspiracy. *In re ICE LIBOR Antitrust Litig.*, No. 19 CIV. 439, 2020 WL 1467354, at *7 (S.D.N.Y. Mar. 26, 2020) (dismissing complaint where plaintiffs asserted that specific defendants had previously been investigated for price fixing and therefore "have the means to do it again," because allegation did not raise an inference of conspiracy); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) ("The law generally disfavors use of such 'historical' evidence."); *see also* Phillip E. Areeda, Antitrust Law, ¶ 1421a, at 125 (1st ed. 1986) ("Illegal behavior elsewhere in time or place does not generally allow the inference of an immediate conspiracy").

\* \* \*

In short, Plaintiffs fail to plead the parallel conduct that is a necessary precondition of pleading a viable antitrust conspiracy by circumstantial evidence, but even if Plaintiff did sufficiently allege parallel conduct, their allegations regarding plus factors are deficient. *See Park Irmat Drug Corp.*, 911 F.3d at 517. The Complaint does not establish that it is more likely that

---

[20] There are no allegations of recidivism on the part of Bayer CropScience LP, Cargill, CHS, Federated, GROWMARK, Inc., GROWMARK FS, LLC, Nutrien, Pioneer Hi-Bred, Simplot, Syngenta, Tenkoz, Univar or Winfield.

Defendants' conduct flowed from a conspiratorial agreement than from their own rational and independent business priorities. Plaintiffs are asking this Court to infer too much based on too little. The only allegations about the existence of a conspiracy between Defendants are conclusory, non-specific allegations and, as a result, Plaintiffs do not offer factual allegations that are enough "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### 4.    The Timing of the Alleged Conspiracy Makes it Implausible

Beyond the plus factors pled by Plaintiffs, there is yet another reason why the claimed conspiracy is implausible: because it purportedly started *years before* the appearance of the electronic platforms, the alleged common stimulus for the alleged boycott. Plaintiffs allege that the conspiracy to boycott the platforms started no later than January 2014, yet there is no reference in the Complaint to (i) any electronic platform's presence in the markets for Crop Inputs; or (ii) any specific conduct by the Defendants, until 2016—two years later. *See* Compl. ¶¶ 118, 57. Plaintiffs do not allege that Crop Input electronic platforms were even contemplated as of January 2014 (or at any point until 2016), and it makes no sense that the Defendants would have hatched a plot in 2014 to boycott electronic platforms that did not yet exist. This disconnect supports dismissal of the entire Complaint, as it makes the entire alleged conspiracy implausible. Furthermore, Plaintiffs paradoxically plead that Defendants hatched a conspiracy in 2014, the result of which was supra-competitive prices. Yet, they indicate that prices have *fallen* since the purported conspiracy began. *See id.* ¶ 44 (referring to "peak prices in 2014"). These contrasting allegations render the pled conspiracy implausible. "[S]ufficiency [of antitrust pleadings] turns on the suggestions raised by [the alleged] conduct when viewed in light of common economic experience." *Twombly*, 550 U.S. at 565.

## II.     PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED AN INJURY THAT GIVES THEM STANDING TO PURSUE THEIR ANTITRUST CLAIMS

Plaintiffs' claims should also be dismissed in their entirety because Plaintiffs fail to sufficiently allege that they have been injured by Defendants' conduct such that they would have Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).[21] Plaintiffs must allege facts sufficient to show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the defendant's challenged conduct, and (3) is redressable by the Court." *Gunawardana v. Am. Veterinary Med. Ass'n*, No. 19-CV-96, 2021 WL 289652, at *13 (S.D. Ill. Jan. 28, 2021) (Rosenstengel, C.J.) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). In addition, "[a]s the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). In order to survive dismissal for lack of standing, "plaintiff's complaint must contain sufficient factual allegations of an injury resulting from the defendants' conduct, accepted as true, to state a claim for relief that is plausible on its face." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 588 (7th Cir. 2016).

Plaintiffs' alleged injuries are more "conjectural" and "hypothetical" than they are "concrete" and "actual." *Lujan*, 504 U.S. at 560. Even crediting Plaintiffs' conclusory allegations that, absent the Defendants' supposed conspiracy, electronic platforms would have introduced greater "transparency" to markets for Crop Inputs, Plaintiffs fail to describe the causal chain by which they would benefit from this "transparency," and any link between transparency and lower

---

[21] To the extent that Plaintiffs' state-law claims depend on allegations of a similarly implausible injury in fact for purposes of standing under Article III of the U.S. Constitution, those claims should likewise be dismissed for lack of standing. *See Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 730–32 (7th Cir. 2020); *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020).

prices is far from obvious. Transparency *might* give Plaintiffs greater information about prices, but it would also provide competing sellers with that same information. There are many more antitrust cases challenging price transparency as anticompetitive than there are challenging price opacity. *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 446–47, 462 (9th Cir. 1990) (holding that jury could infer that publication of wholesale prices on gas pumps was intended to effectuate price fixing at the wholesale level); *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9 (D.D.C. 1993) (approving consent decree prohibiting publication of future tariff rates because such disclosure dampened competition among airlines); *cf. Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 894 (9th Cir. 2008) (striking down state statutory requirement that each beer and wine wholesaler make wholesale prices publicly available and adhere to them for 30 days because "the logical result of the restraints is a less uncertain market, a market more conducive to collusive and stabilized pricing, and hence a less competitive market"). "Opacity" is not a standalone antitrust injury,[22] and transparency for the sake of transparency is not inherently procompetitive. Plaintiffs have thus failed to allege the necessary factual predicate to suggest that transparency in Plaintiffs' multi-tiered markets would have resulted in the lower prices.[23]

---

[22] Plaintiffs have no "legally protected interest" in greater transparency that could, in itself, be sufficient to confer Article III standing. *Lujan*, 504 U.S. at 560; *see also Kawczynski v. Am. Coll. of Cardiology*, 670 F. App'x 398, 399 (7th Cir. 2016) ("[The plaintiff] has no legally protected right to dictate what information the defendants 'direct' physicians to provide their patients.").

[23] As (at most) an *indirect* purchaser of Crop Inputs vis-à-vis Defendants, Plaintiff Charles Lex also lacks standing to pursue damages under federal antitrust law under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–746 (1977). Plaintiff Jason Canjar also does not allege that he purchased Crop Inputs *directly* from one or more Defendants (*see* Compl. ¶ 21), so he similarly lacks standing.

To the extent that Plaintiffs are instead complaining about the alleged exclusion of FBN from retail competition to sell "Crop Inputs," the claim of injury is even more tenuous. The apparent premise of Plaintiffs' theory is the speculation that FBN—one retailer—would have somehow disrupted markets for every single Crop Input nationwide. But Plaintiffs' allegations do not plausibly support that conclusion. Plaintiffs only summarily allege that FBN would have offered Crop Inputs for sale at lower prices than other retailers, Compl. ¶ 79, and never explain from whom or at what prices FBN would purchase Crop Inputs or how FBN could plausibly undercut prices for every single Crop Input. And Plaintiffs offer no facts indicating the level of competition in the retail marketplace, including no allegations of how many competitors there are, and how many are not defendants here. Unless Plaintiffs can demonstrate that the retail marketplace is something other than highly competitive, the mere entry of a single additional competitor would not meaningfully impact competition. In short, Plaintiffs do not plead sufficient facts to establish injury under this theory.

By failing to adequately allege any injury, or the factual basis for a link between that injury and Defendants' alleged conduct, Plaintiffs have failed to plausibly plead standing to assert their claims. The Complaint should therefore be dismissed.

## III.   PLAINTIFFS' SHERMAN ACT CLAIM IS UNTIMELY

### A.   Plaintiffs' Claim Should Be Dismissed to the Extent it Is Based on Conduct That Occurred Before the Four-Year Statute of Limitations

In addition to failing under *Twombly*, Plaintiffs' Sherman Act claim also should be dismissed as to alleged damages incurred more than four years before the filing of the Complaint based on the applicable four-year statute of limitations. 15 U.S.C. § 15b; *see In re Copper Antitrust*

*Litig.*, 436 F.3d 782, 789 (7th Cir. 2006).[24] "Generally, an antitrust 'cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)). Here, Plaintiffs commenced this action on January 8, 2021. All of Defendants' alleged conduct that occurred before January 8, 2017 is outside the statute of limitations. And Plaintiffs have not plausibly alleged facts establishing fraudulent concealment or any other basis for extending the limitations period beyond four years.

**B.    Plaintiffs Do Not Plead Fraudulent Concealment**

Recognizing that their damages claim is stale, Plaintiffs invoke equitable tolling based on the doctrine of fraudulent concealment. Compl. ¶¶ 113–16. However, this doctrine does not save their untimely Sherman Act claim. To establish fraudulent concealment, a plaintiff must allege and prove: (1) an affirmative act or statement by the defendant, above and beyond the wrongdoing upon which the claim is founded, that concealed a potential claim; and (2) that the plaintiff "'neither knew nor, in the exercise of due diligence, could reasonably have known of the offense.'" *In re Copper Antitrust Litig.*, 436 F.3d at 791 (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997)). In those circumstances, the statute of limitations may be equitably tolled until "a reasonable person would believe he may have a cause of action." *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995). "[A] plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'" *Klehr*, 521 U.S. at 194.

---

[24] The statute of limitations may appropriately be raised in a motion to dismiss where, as here, "'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense.'" *Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)) (affirming grant of a motion to dismiss pursuant to Rule 12(b)(6) on statute of limitations grounds).

Allegations of fraudulent concealment must be pleaded with particularity pursuant to the heightened pleading standard of Rule 9(b). *Pastorelli Food Prods., Inc. v. Pillsbury Co.*, No. 87 C 20233, 1989 WL 58366, at *1–2 (N.D. Ill. Apr. 11, 1989); *see also Zirvi v. Flatley*, 838 F. App'x 582, 585 (2d Cir. 2020) ("[T]he standard of factual pleading is higher when plaintiffs seek to equitably toll a limitations period under the doctrine of fraudulent concealment, for plaintiffs must plead the elements of fraudulent concealment with particularity . . . ."). "Particularity" requires pleading "the who, what, where, and when of the alleged fraud." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). "An allegation of time or place is material when testing the sufficiency of a pleading." Fed. R. Civ. P. 9(f).

Plaintiffs do not plead facts supporting either element of fraudulent concealment, much less with the particularity required by Rule 9.

### 1.   Plaintiffs Do Not Plead Separate Acts of Concealment

Plaintiffs must plead more than generic statements of secrecy to constitute fraudulent concealment. To hold otherwise would "effectively nullify the statute of limitations" because antitrust conspiracy cases inherently involve allegations of a cover-up. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987). Accordingly, Plaintiffs must assert acts of concealment of the collusion by each Defendant "above and beyond the wrongdoing upon which [their] claim is founded." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990). Plaintiffs must allege that *each* Defendant "actively concealed its alleged antitrust activities through acts entirely extrinsic to the alleged activity." ABA Model Jury Instrs. in Civil Antitrust Cases § 7.A.2 n.4 (2016 ed.); *see In re Copper Antitrust Litig.*, 436 F.3d at 791. And they must allege those acts with particularity. *Pastorelli*, 1989 WL 58366, at *1–2.

Plaintiffs fail to allege any acts of concealment other than the same vague recitals underpinning their substantive claim. *See, e.g.*, Compl. ¶ 113 (advocating tolling "as a result of the

- 40 -

unlawful combination and conspiracy alleged in this Complaint"); *id.* ¶ 114 (vaguely asserting "[g]roup boycotts and other antitrust violations are inherently self-concealing"); *id.* ¶ 115 (alleging that the Crop Inputs market is "is structured to maximize opacity," without explaining whether this "structuring" is new, much less that it was the result of deliberate conduct intended to conceal the alleged conspiracy). Those blanket assertions mirror the non-particularized allegations made to support Plaintiffs' Sherman Act claim. *See, e.g.*, *id.* ¶ 6 ("Defendants conspired to block the platforms' access to Crop Inputs by engaging in a group boycott."); *id.* ¶ 10 ("As a result of Defendants' misconduct, farmers remain trapped in an inefficient, opaque Crop Inputs market . . . ."). This approach "'merges the substantive wrong with the tolling doctrine,' and thus cannot be the basis for granting Plaintiff[s] equitable relief." *Angiulo v. United States*, 867 F. Supp. 2d 990, 1000 (N.D. Ill. 2012) (quoting *Cada*, 920 F.2d at 451). The Complaint references commonplace aspects of many competitive markets, such as a lack of visibility into pricing information—but these bare assertions do not, and cannot, amount to fraudulent concealment. *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 462 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020). Having failed to identify any specific conduct indicating that Defendants "actively concealed" the alleged conspiracy, Plaintiffs' concealment assertion rings hollow.

Further, Plaintiffs fall far short of pleading "the who, what, where, and when of the alleged" concealment. *Ackerman*, 172 F.3d at 469; *see also supra* at Argument, Section I(A) (group pleading insufficient). Defendants' supposed fraud consists of vague claims of "opacity" and "muddy . . . waters" and unspecified meetings involving unspecified participants where unspecified discussions allegedly occurred. Compl. ¶¶ 115–16. Plaintiffs thus fail to satisfy the heightened pleading standard for fraud under Rule 9.

## 2.        Plaintiffs Do Not Plead Reasonable Diligence

While the Complaint fails to allege separate acts of concealment by Defendants (let alone by each Defendant), the allegations do show that Plaintiffs failed to exercise reasonable diligence. That requirement recognizes that a primary purpose of civil antitrust cases is "to encourage . . . victims themselves diligently to investigate and thereby to uncover unlawful activity." *Klehr*, 521 U.S. at 195. "Conclusory allegations of due diligence are not sufficient; where a plaintiff has utterly failed to make even the requisite allegations, he cannot claim that his underlying cause of action was fraudulently concealed." *Berkson v. Del Monte Corp.*, 743 F.2d 53, 56–57 (1st Cir. 1984) (internal citations omitted); *see also* Fed. R. Civ. P. 9(f).

The Complaint amply shows that Plaintiffs did not exercise the requisite reasonable diligence in discovering their claims. The Complaint describes publicly available data, including from 2014, on Crop Input pricing (Compl. ¶¶ 45–47); industry publications and widely distributed letters to farmers in 2016 regarding the alleged threat posed by electronic Crop Input sales platforms (*id.* ¶¶ 58–61); and the purported struggle companies like FBN faced in 2016 when entering the Crop Inputs market (*id.* ¶ 66). Despite alleging ample notice in 2014 and 2016 of the conduct complained of, the Complaint identifies *nothing* Plaintiffs did to investigate.

Plaintiffs nevertheless contend that they lacked visibility into Defendants' pricing and distribution contracts and could not attend unidentified meetings of unidentified "boards" and "executive committees," at which unidentified representatives from unspecified Defendants purportedly agreed to further the conspiracy alleged by Plaintiffs. *Id.* ¶ 116. However, Plaintiffs were well aware of their alleged lack of pricing visibility since at least 2014. And if the boycott kept electronic platforms out of the retail Crop Inputs market, the absence of the platforms would have been obvious to growers that participate regularly in that marketplace. Regardless, what Plaintiffs contend they could *not* see says little about whether they exercised reasonable—or any—

diligence. On that point, their allegations allow only one inference: Plaintiffs did nothing until (at a date not stated) they learned of an investigation by Canadian authorities of conduct in Canada of one of 16 Defendants. *Id.* ¶ 114.[25] Because Plaintiffs fail to allege that they acted diligently in seeking information about their claims, fraudulent concealment is unavailable to extend the limitations period to damages allegedly suffered more than four years before the filing of the Complaint. *See Simms v. Acevedo*, 595 F.3d 774, 781 (7th Cir. 2010) (quoting *Wilson v. Battles*, 302 F.3d 745, 749 (7th Cir. 2002)) ("'Equitable tolling is granted sparingly only when extraordinary circumstances far beyond the litigant's control prevented timely filing.'").

## IV.   ALL OF PLAINTIFFS' STATE-LAW CLAIMS SHOULD BE DISMISSED

### A.   All of Plaintiffs' State-Law Claims Fail for the Same Reasons That Their Federal Claim Fails

As explained above, Plaintiffs' sole federal claim for violation of the Sherman Act § 1 fails because Plaintiffs do not allege sufficient facts to plausibly establish the existence of the requisite "agreement" to restrain trade. *See* 15 U.S.C. § 1 (declaring illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade"); *Twombly*, 550 U.S. at 544–55 (Sherman Act § 1 requires plaintiffs to allege "enough factual matter (taken as true) to suggest that an agreement was made."). All of Plaintiffs' claims under the antitrust statutes of 27 states fail for the same reason their federal claim fails and for additional reasons.[26]

Although the terminology of the state statutes differs slightly, each prohibits agreements in restraint of trade. Nineteen of the statutes (Arizona, Connecticut, Hawaii, Illinois, Iowa, Maine,

---

[25] Although Plaintiffs allege that an *ex parte* application for records production was granted in February 2020, Compl. ¶ 90, there is no indication of when the Canadian Competition Bureau's investigation began or any allegation of when or how Plaintiffs learned of the investigation.

[26] For ease of reference, a chart summarizing the grounds for dismissing each of Plaintiffs' state-law claims is attached hereto as Exhibit A.

Maryland, Michigan, Minnesota, Nebraska, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Utah, West Virginia, and Wisconsin) use language that is identical or virtually identical to the language of Sherman Act § 1.[27] The eight remaining state statutes either expressly require proof of joint conduct or have been interpreted to require such proof:

1.   The California Cartwright Act bars "trusts," Cal. Bus. & Prof. Code § 16726, which are defined to be "combination[s] of capital, skill or acts by two or more persons" to restrain trade, reduce production, or increase prices. Cal. Bus. & Prof. Code § 16720.

2.   The Florida Deceptive and Unfair Trade Practices Act (FDUTPA) prohibits "[u]nfair methods of competition" and "unconscionable acts or practices" and is based on Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1). Fla. Stat. § 501.204. Because Section 5 of the FTC Act incorporates violations of the Sherman Act, *see F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986), FDUTPA similarly incorporates violations of the Sherman Act. *See Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 104 (Fla. Dist. Ct. App. 1996).

3.   The Kansas Restraint of Trade Act declares "trusts" to be unlawful and defines them to be "combination[s] of capital, skill or acts by two or more persons" to restrain trade, reduce production, or increase prices. Kan. Stat. § 50-101.

4.   The Mississippi Antitrust Laws declare "trusts" to be unlawful and defines them to be a "combination, contract, understanding or agreement, expressed or implied, between two or more persons . . . [t]o restrain trade." Miss. Code § 75-21-1(a).

5.   The Nevada Unfair Trade Practices Act prohibits every enumerated "contract, combination or conspiracy in restraint of trade," including "agreements not to sell to specified customers of a competitor." Nev. Rev. Stat. § 598A.060(c).

6.   The New York Donnelly Act prohibits "[e]very contract, agreement, or arrangement or combination" whereby "[c]ompetition . . . in the conduct of any business . . . is or may be restrained." N.Y. Gen. Bus. Law § 340(1).

---

[27] Ariz. Rev. Stat. § 44-1402; Conn. Gen. Stat. § 35-26; Haw. Rev. Stat. § 480-4; 740 Ill. Comp. Stat. 10/3(2); Iowa Code § 553.4; Me. Rev. Stat. Title 10 § 1101; Md. Code Com. Law § 11-204(a)(1); Mich. Comp. Laws § 445.772; Minn. Stat. § 325D.51; Neb. Rev. Stat. § 59-801; N.H. Rev. Stat. § 598A.060; N.M. Stat. § 57-1-1; N.C. Gen. Stat. § 75-1; N.D. Cent. Code § 51-08.1-02; Or. Rev. Stat. § 646.725; S.D. Codified Laws § 37-1-3.1; Utah Code § 76-10-3104; W. Va. Code 47-18-4; Wis. Stat. § 133.03.

7.     The Tennessee Trade Practices Act prohibits "[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition." Tenn. Code § 47-25-101.

8.     The Vermont Consumer Protection Laws prohibit "collusion," 9 Vt. Stat. § 2453a, which is defined to mean "an agreement, contract, combination in the form or trusts or otherwise, or conspiracy." 9 Vt. Stat. § 2451a(h).

Plaintiffs' state-law claims should therefore be dismissed for the same reasons as Plaintiffs' federal antitrust claims. *See, e.g.*, *Rick-Mik Enters. v. Equilon Enters., LLC*, 532 F.3d 963, 976 n.5 (9th Cir. 2008) (affirming dismissal of state-law antitrust claims that are derivative of deficient federal antitrust claims); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 847 (N.D. Ill. 2020) (same); *Marion HealthCare LLC v. S. Ill. Healthcare*, No. 12-CV-00871, 2013 WL 4510168, at *14 (S.D. Ill. Aug. 26, 2013) (same).

## B.     Plaintiffs Do Not Have Article III Standing

### 1.     Plaintiffs Lack Article III Standing Because They Fail to Allege Cognizable Injuries

Named plaintiffs who represent a class must meet the standing requirements of Article III, which requires an injury in fact, traceable to the defendants, that can be redressed by a favorable decision. *Lewis v. Casey*, 518 U.S. 343, 357 (1996). As noted, Plaintiffs' federal claim fails because their allegations of price-opacity are not a cognizable injury, and their allegations that Defendants' allegedly excluded a single retail competitor does not raise a plausible inference of the requisite injury to themselves. Plaintiffs' state-law claims fail for the same reasons.

### 2.     Plaintiffs Lack Article III Standing to Sue under the Laws of 23 States Where They Do Not Reside or Did Not Suffer Injury

Plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975); *see also Payton v. Cnty. of Kane*,

308 F.3d 673, 682 (7th Cir. 2002) ("[I]t bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action.").

Plaintiffs must demonstrate standing for each claim they that seek to press. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Allen v. Wright*, 468 U.S. 737, 752 (1984) ("The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted."). When, as here, plaintiffs allege that they suffered overcharges caused by violations of a state's antitrust law, they must allege either that they (i) reside in the state, or (ii) have purchased the goods within the state to establish Article III standing. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2013 WL 4506000, at *7–8  (N.D. Ill. Aug. 23, 2013).

Plaintiffs allegedly reside or bought Crop Inputs in only four states under whose laws Plaintiffs assert claims: Illinois (Piper), Iowa (Lex), Mississippi (Jones Planting Co. III), and New York (Swanson, Schofield Farms, LLC).[28] *See* Compl. ¶¶ 16–20. No named Plaintiff in this action resides or bought Crop Inputs in the other 23 states under whose laws Plaintiffs collectively assert claims. Because Plaintiffs lack Article III standing to bring claims under the laws of any other states, their claims under the laws of the other 23 states should be dismissed. *Dairy Farmers*, 2013 WL 4506000, at *8–9; *In re Interior Molded Doors Antitrust Litig.*, No. 3:18-cv-718, 2019 WL 4478734, at *12–13 (E.D. Va. Sept. 18, 2019); *Jones*, 400 F. Supp. 3d at 911; *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1372 (S.D. Fla. 2001).

---

[28] A sixth Plaintiff, Jason J. Canjar, allegedly resides in Pennsylvania, Compl. ¶ 21, but the Complaint does not allege any violations of Pennsylvania law.

Dismissal of Plaintiffs' claims under the laws of the following 23 states is therefore appropriate: Arizona, California, Connecticut, Florida, Hawaii, Kansas, Maine, Maryland, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

### C.   Plaintiffs' Claims Fail in Certain States for Reasons Specific to Those States' Laws

#### 1.   Three of Plaintiffs' State Antitrust Claims Should Be Dismissed for Failure to Satisfy Filing-Notice Requirements

Plaintiffs have asserted violations in four states (Arizona, Hawaii, Nevada, and Utah) that require private plaintiffs to notify their state attorneys general upon filing such claims,[29] but they allege that they satisfied this filing-notice requirement in only one state (Nevada). *See* Compl. ¶ 217. The statutory language of each of these filing-notice provisions directs that a plaintiff "shall" meet this requirement and is thus mandatory. For this reason, the filing-notice requirements are not merely procedural niceties but prerequisites to suit. *In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 413 (D.N.J. 2018) (dismissing Arizona, Hawaii, Nevada, and Utah claims for failure to comply with filing-notice provisions). As Plaintiffs plead that they complied with this requirement only in Nevada, their claims under the antitrust laws of Arizona, Hawaii, and Utah must be dismissed.

---

[29] *See*, *e.g.*, Ariz. Rev. Stat. § 44-1415(A) (plaintiffs "shall simultaneously with the filing of . . . pendent state law claims in the federal court, serve a copy of the complaint . . . on the attorney general," and "[p]roof of service on the attorney general shall be filed with the court."); *accord* Haw. Rev. Stat. § 480-13.3(1); Nev. Rev. Stat. § 598A.210(3); and Utah Code § 76-10-3109(9).

### 2.   Four of Plaintiffs' State-Law Claims Should Be Dismissed for Lack of Any Alleged Intrastate Misconduct or Substantial Intrastate Effects

Plaintiffs have asserted antitrust violations in four states (Mississippi, South Dakota, Tennessee, and Wisconsin) which require allegations that misconduct either occurred within the state or had a substantial effect (beyond price increases) on the state's commerce. *See State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So.3d 1178, 1189 (Miss. 2020) (affirming judgment of dismissal because the plaintiff did not allege any "wholly intrastate" transactions by the defendants); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1099 (N.D. Cal. 2007) (dismissing claims under South Dakota antitrust statute where no misconduct was alleged to have occurred in South Dakota and the only effect in the state was allegedly inflated prices); *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 524 (Tenn. 2005) (substantial effects on Tennessee commerce are required; allegations that prices were raised as a result of conduct is insufficient); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 549 (N.D. Ill. 2019) (dismissing claims under Wisconsin antitrust statute where no misconduct was alleged to have occurred in Wisconsin and the only effect in the state was allegedly inflated prices).

Because the Complaint does not allege that the requisite level of misconduct or effects specifically occurred in the states of Mississippi, South Dakota, Tennessee, and Wisconsin, Plaintiffs' claims under those four states' laws must therefore be dismissed.

### D.   Plaintiffs' Antitrust Claims Are Untimely in All 27 States

Plaintiffs' antitrust claims in 21 states (Arizona, California, Connecticut, Florida, Hawaii, Illinois, Iowa, Maryland, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Utah, and West Virginia) have the same 4-year statute of limitations as their Sherman Act § 1 claim and are untimely for the same

reasons and to the same extent.[30] Plaintiffs' claims are even more untimely in the three states with 3-year antitrust statutes of limitation (Kansas, Mississippi, and Tennessee).[31] The three remaining states (Maine, Vermont, and Wisconsin) have 6-year statutes of limitation on antitrust claims.[32]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request dismissal of the Complaint with prejudice.

---

[30] Ariz. Rev. Stat. § 44-1410; Cal. Bus. & Prof. Code §§ 16750.1, 17208; Conn. Gen. Stat. §§ 35-40; Fla. Stat. § 95.11(3)(f); Haw. Rev. Stat. § 480-24; 740 Ill. Comp. Stat. 10/7(2); Iowa Code § 553.16(2); Md. Code Com. Law § 11-209(d)(1); Mich. Comp. Laws § 445.781; Minn. Stat. § 325D.64; Neb. Rev. Stat. § 25-212; Nev. Rev. Stat. § 598A.220(1), (2)(a); N.H. Rev. Stat. § 356:12.II; N.M. Stat. § 57-1-12; N.Y. Gen. Bus. Law § 340(5); N.C. Gen. Stat. § 75-16.2; N.D. Cent. Code § 51.08.1-10; Or. Rev. Stat. § 646.800(2); S.D. Codified Laws § 37-1-14.4; Utah Code § 76-10-3117; and W. Va, Code § 47-18-11.

[31] Kan. Stat. § 60–512(2); *Four B. Corp. v. Dicel Chem. Indus. Ltd.*, 253 F. Supp. 2d 1147, 1155 (D. Kan. 2003); Miss. Code. § 15-1-49(1); *State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at *3 (Tenn. Ch. Sept. 25, 1980) (interpreting Tenn. Code §§ 47-25-101 to 112).

[32] Me. Rev. Stat. Title 14 § 752; 12 Vt. Stat. § 511; and Wis. Stat. § 133.18(2)).

Dated:  May 5, 2021                                    Respectfully submitted by:

 /s/ *Troy Bozarth*                                    */s/ Erick E. VanDorn* (with consent)
Troy A. Bozarth – #6236748                            Erick E. VanDorn, #6256805
**HEPLERBROOM LLC**                                   THOMPSON COBURN LLP
130 N. Main St.                                        525 W. Main Street Suite 300
P.O. Box 510                                           Belleville, IL 62220
Edwardsville, IL 62025                                 Phone: (618) 277-4700
Tel: (618) 656-0184                                    evandorn@thompsoncoburn.com
tab@heplerbroom.com

                                                       Christopher M. Hohn, #6230989
David J. Lender (*admission forthcoming*)             Sharon B. Rosenberg, #6287232
Adam C. Hemlock (*admission forthcoming*)             Edwin G. Harvey, #6184294
**WEIL, GOTSHAL & MANGES LLP**                        THOMPSON COBURN LLP
767 Fifth Avenue                                       One US Bank Plaza
New York, NY 10153                                     St. Louis MO 63101
Tel: (212) 310-8000                                    Phone: (314) 552-6000
David.Lender@weil.com                                  chohn@thompsoncoburn.com
Adam.Hemlock@weil.com                                  srosenberg@thompsoncoburn.com

Lara B. Bach (*admission forthcoming*)                Jonathan I. Gleklen, *pro hac vice*
**WEIL, GOTSHAL & MANGES LLP**                        Laura S. Shores, *pro hac vice*
1395 Brickell Avenue, Suite 1200                       ARNOLD & PORTER KAYE SCHOLER
Miami, FL 33131                                        LLP
Tel: (305) 577-3100                                    601 Massachusetts Ave., NW
Lara.Bach@weil.com                                     Washington, DC 20001
                                                       Phone: (202) 942-5000
                                                       jonathan.gleklen@arnoldporter.com
**Attorney for BASF Corporation**                     laura.shores@arnoldporter.com

                                                       **Attorneys for Bayer CropScience LP
                                                       and Bayer CropScience Inc.**

/s/ *Eric Mahr* (with consent)
Eric Mahr (admitted *pro hac vice*)
**FRESHFIELDS BRUCKHAUS
DERINGER US LLP**
700 13th Street NW, 10th Floor
Washington, DC 20005-3960
Tel: (202) 777-4545
Fax: (202) 777-4555
eric.mahr@freshfields.com

*Counsel for Defendant Cargill,
Incorporated*

/s/ *Kathy L. Osborn* (with consent)
Kathy L. Osborn (admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
300 N. Meridian St., Suite 2500
Indianapolis, IN 46204
Telephone:  (317) 237-8261
Email:  kathy.osborn@faegredrinker.com

Colby Anne Kingsbury
FAEGRE DRINKER BIDDLE & REATH LLP
311 S. Wacker Dr., #4400
Chicago, IL 60606
Telephone:  (312) 212-6573
Email:  colby.kingsbury@faegredrinker.com

*Counsel for Defendant CHS, Inc.*

/s/ *Donald M. Flack* (with consent)
Donald M. Flack
ARMSTRONG TEASDALE LLP
115 N. Second St.
Edwardsville, IL 62025
Tel: (314) 342-4143
dflack@atllp.com

Leslie E. John (admitted *pro hac vice*)
Jason A. Leckerman (admitted *pro hac vice*)
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Tel: (215) 665-8500
johnl@ballardspahr.com
leckermanj@ballardspahr.com

*Counsel for Defendants Corteva, Inc.
and Pioneer Hi-Bred International, Inc.*

/s/ *Michael L. McCluggage* (with consent)
Michael L. McCluggage
Barak S. Echols (*admission forthcoming*)
EIMER STAHL LLP
224 S. Michigan Ave.
Suite 1100
Chicago, IL 60604
(312) 660-7600 (telephone)
(312) 692-1718 (facsimile)
mmccluggage@eimerstahl.com
bechols@eimerstahl.com

Collin J. Vierra (*pro hac vice forthcoming*)
EIMER STAHL LLP
99 South Almaden Boulevard
Suite 662
San Jose, CA 85113
(669) 231-8755 (telephone)
(312) 692-1718 (facsimile)
cvierra@eimerstahl.com

*Counsel for Defendant Federated
Co-operatives Limited*

- 51 -

/s/ *Barry S. Noeltner* (with consent)
Barry S. Noeltner, ARDC #6190817
HEYL, ROYSTER, VOELKER &
ALLEN, P.C.
Suite 100
Mark Twain Plaza III
105 West Vandalia Street
Edwardsville, Illinois 62025
Telephone:  618.656.4646
PRIMARY E-SERVICE -
wecf@heylroyster.com
SECONDARY E-SERVICE –
bnoeltner@heylroyster.com

**Counsel for Defendants GROWMARK, Inc.
and GROWMARK FS, LLC**

/s/ *Travis H. Campbell* (with consent)
Travis H. Campbell
BRYAN CAVE LEIGHTON PAISNER LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102
(314) 259-2000
(314) 259-2020 (facsimile)
travis.campbell@bclplaw.com

**Attorneys for Defendant Nutrien Ag
Solutions, Inc.**

/s/ *Eric D. Brandfonbrener* (with consent)
Eric D. Brandfonbrener
PERKINS COIE, LLP
131 S. Dearborn St., Suite 1700
Chicago, IL 60603
312-324-8400
312-324-9400-Fax
Email: ebrand@perkinscoie.com

**Counsel for Defendant Simplot AB
Retail, Sub, Inc.**

/s/ *Paul S. Mishkin* (with consent)
Paul S. Mishkin (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Tel: 212-450-4292
paul.mishkin@davispolk.com

Michael J. Nester #2037211
DONOVAN ROSE NESTER, P.C.
15 North 1st Street, Suite A
Belleville, IL 62220
Tel: 618-212-6500
mnester@drnpc.com

**Attorneys for Syngenta Corporation**

/s/ *Lee A. Peifer*  (with consent)
Lee A. Peifer (*pro hac vice*)
James R. McGibbon (*pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, GA 30309-3996
Tel: 404-853-8000
Fax: 404-853-8806
leepeifer@eversheds-sutherland.com
jimmcgibbon@eversheds-sutherland.com

Timothy J. McCaffrey (Ill. Bar No. 6229804)
EVERSHEDS SUTHERLAND (US) LLP
900 N Michigan Avenue, Suite 1000
Chicago, Illinois 60611
312-724-9006 (tel.)
312-724-9322 (fax)
timmccaffrey@eversheds-sutherland.com

**Attorneys for Tenkoz, Inc.**

/s/ *Nathan P. Eimer* (with consent)
Nathan P. Eimer
Vanessa G. Jacobsen
Brian Y. Chang
Sarah H. Catalano
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Tel: 312-660-7600
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
bchang@eimerstahl.com
scatalano@eimerstahl.com

**Attorneys for Winfield Solutions, LLC**

/s/ *Craig C. Martin* (with consent)
Craig C. Martin
Matt D. Basil
**Willkie Farr & Gallagher LLP**
300 North LaSalle
Chicago, IL 60654-3406
Telephone: (312) 728-9000
cmartin@willkie.com
mbasil@willkie.com

**Attorneys for Univar Solutions Inc.**

**CERTIFICATE OF SERVICE**

I, Troy Bozarth, an attorney, hereby certify that I filed Defendants' Motion to Dismiss Plaintiffs' Class Action Consolidated Complaint using the CM/ECF system on this 5th day of May 2021. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

/s/ *Troy Bozarth*_____
Troy Bozarth